Bethany **GODBY**, etc., Plaintiffs,

v.

**MONTGOMERY COUNTY BOARD OF EDUCATION, et al., Defendants.**

No. Civ.A. 97–A–040–N.

United States District Court,
M.D. Alabama,
Northern Division.

March 9, 1998.

J. Richard Cohen, Southern Poverty Law Center, Montgomery, AL, M. Wayne Sabel, Mark W. Sabel, Jr., Sabel & Sabel, P.C., Montgomery, AL, for Bethany Godby, by and through her next friends, Jeffery Godby, and Kristine Godby, Plaintiffs.

James R. Seale, Martha Ann Miller, Robison & Belser, P.A., Montgomery, AL, Mark S. Boardman, J. Wesley Hughes, Boardman & Tyra, P.C., Birmingham, AL, for Defendants.

## MEMORANDUM OPINION

ALBRITTON, Chief Judge.

This cause is before the court on the Motion for Summary Judgment filed on July 25, 1997, by the Defendants, Montgomery County Board of Education ("MCBOE"), Superintendent John A. Eberhart, Principal Jethro Wilson, and teachers John Bradford and Holli Lovrich. The case was filed by Bethany Godby because of events which occurred while she was a student at Cloverdale Junior

High School. Her complaint is that the Defendants racially discriminated against her and violated other of her federal rights in violation of 42 U.S.C. §§ 1981, 1983, 1985, 1986, and Title VI; and violated Alabama state law by negligently supervising their employees and invading her privacy.

This court has jurisdiction over the claims which state a violation of federal law. 28 U.S.C. § 1331. The court also has jurisdiction over the state law claims based on supplemental jurisdiction. 28 U.S.C. § 1367. For the reasons discussed herein, the motion for summary judgment is due to be GRANTED in part and DENIED in part.

### I. *SUMMARY JUDGMENT STANDARD*

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.

If the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists. *See Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991); *see also* Fed.R.Civ.P. 56(e). A dispute of material fact "is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the mov-

ant. *See Peppers v. Coates,* 887 F.2d 1493 (11th Cir.1989).

### II. *FACTS*

As is required at the summary judgment stage, the "facts" in this case are viewed in the light most favorable to the non-movant Plaintiffs, the Godbys. *Anderson,* 477 U.S. at 255.

The primary Plaintiff in this case, Bethany Godby, is a mixed-race child. Her father is white and her mother is black. Bethany thinks of herself as being "both" races; and when she has been asked for her race on forms, such as those at school, she has routinely checked both categories. *B. Godby Depo. 11; Plaintiff's exh. 14 (Cloverdale Jr. High School class selection form dated 8–28–95); Plaintiff's exh. 15 (Montgomery Public Schools Registration Cards from 1993–96).*

Homecoming queen elections at her school, Cloverdale Junior High in Montgomery, elect (or at least elected) the queens and their courts according to their race. Students are asked to nominate "white" students and "black" students, separately. The seventh and eighth grades each have two representatives on the homecoming court—a student of each race from each grade. Ninth grade has a queen, who is the top vote getter, and two attendants, a white one and a black one.

### *The Election.*

Bethany Godby was in the ninth grade at Cloverdale Junior High School in 1996–97, when this dispute began. On September 10 of that school year, her homeroom held a vote to nominate students for the school-wide homecoming queen election. Godby's homeroom teacher, Defendant Bradford, was not present, so the vote was conducted by a substitute teacher (who is not a defendant). Students were asked to separately nominate students as either white or black. The winner from each category in the homeroom would be that homeroom's nominee for the school-wide ballot. The school-wide ballot was also divided into two racial categories: white and black.

Godby was not in her homeroom when the vote started. She learned upon returning, however, that she had been suggested by one

of her classmates as a candidate for the homeroom's black nominee. Matters became complicated when one of her classmates said that she should run as the homeroom's white nominee. Other students complained that it would be unfair for Godby to run for both slots, and a discussion about race ensued among the students. *B. Godby Depo. 21.* The substitute teacher left to consult with Ms. Lovrich, the school's homecoming director.[1]

Lovrich went to the room and talked to Godby about the situation. Lovrich took Godby into the hall and told her that she had to choose one or the other slot in which to run; Godby could not run for both. *B. Godby Depo. 22.* In effect, the biracial child had to choose: was she white or black? Godby returned to the room and asked her classmates which slot she should choose. The majority of the classmates told her that she should run as the white nominee. Godby ran for the white slot and was selected as her homeroom's nominee. *B. Godby Depo. 23.*

Godby's nomination during the first vote never made it to the general student body for a vote, however. The school officials have maintained from early on that the first election was invalidated because the girl who received the black nomination from Godby's homeroom had helped count the votes. This was thought improper. Plaintiffs have not contested that the black nominee helped count the votes. Plaintiffs have noted facts, however, which at least make it appear that other reasons may have led to the invalidation of the first election. Ms. Lovrich has admitted that she used the school computer in the guidance counselor's office to look up Godby's race after the first ballot was taken. Ms. Lovrich testified in deposition that the registry on the school computer listed Godby as black. Lovrich did this search because she thought that it was her "duty to make

sure what [Godby] was telling me was true." *Lovrich Depo. 18:12 – 20:5.*

In any event, however, the first set of nominations was invalidated. Lovrich asked Bradford to redo the elections for both the white and black nominees from his homeroom. On the next day, a second round of votes was taken to get nominations. The school officials have maintained that Godby simply did not win the white nomination of her homeroom during this second vote. Godby has presented evidence, however, that she did win the white nomination of her homeroom during the second vote. This evidence includes her own testimony, affidavits from other students, and the results of a questionnaire given to the students by school officials.[2] Godby herself says that there were no other white nominees from her classroom, so she was selected by default. She was the only nominee, even though students in the homeroom were allowed to nominate anyone from throughout the school.

Taking the facts in the light most favorable to Godby, therefore, it appears that she was nominated by her homeroom as a white nominee for the school-wide election. Godby's name was not on the school-wide ballot when it appeared, however. That fact is uncontested. School officials have maintained that Godby was not removed from the school-wide ballot, but was simply not nominated by her homeroom on the second try. Godby suggests improper action, however, and presents the evidence of her election, and Ms. Lovrich's admitted actions.

Godby did not learn that her name was not on the ballot until it was distributed to everyone. She asked Mr. Bradford why her name was not on the ballot, but he said that he did not know. He admits that he at first said that he did not know. *Bradford Depo. 25.21 – 26:6 .* He would not allow her to leave

---

1. It seems that the school system as a whole allowed individual schools to develop their own policies regarding homecoming. *See Eberhart Depo. 22:2–12.* Within Cloverdale, Principal Wilson appointed Ms. Lovrich to take charge of the homecoming activities.

2. A separate questionnaire was given to each student by MCBOE officials regarding the second ballot. The results show: 10 students remem-

bered that Godby had won the white nomination of her homeroom; 11 students did not know who had won; and three students thought that another girl had won the white nomination. Despite the presence of the press, top system officials, and lawyers at Cloverdale, innocence has apparently not been completely lost. A boy named Marcus said that he had been elected as the white nominee.

the room to ask someone at that time. Later in the day, Godby asked Lovrich why her name had not been on the ballot. Lovrich at first told her that she had not been nominated, but then, according to Godby, told Godby that it was because Lovrich had looked up her school records and discovered that Godby was black.

### The Policy of the School.

After the election, Godby's parents met with the principal of Cloverdale, Jethro Wilson, on two occasions: once with just Mrs. Godby present, a second time with both parents in attendance. *Wilson Depo. 72:5–9.* Wilson claimed to not know anything about the incident, but told them that he would look into it. Wilson says that he talked to Mrs. Godby about the perceptions of society that mixed children are thought of as black. *Wilson Depo. 64:7 – 66:9.* As stated by Mrs. Godby, Wilson and she talked about how the biracial election system was set up in the '60s, "mulattos," "quadroons," the effects of "one or two drops of black blood," and how it had been back in New Orleans. *K. Godby Depo. 14:19 – 17:8; Wilson Depo. 62:5 – 66:2..* Wilson also showed Mrs. Godby that Bethany's registration on the computer showed her to be black. *Wilson Depo. 67:7–10.*

Wilson testified that Cloverdale had a dual election system at the time that he became principal and that he continued that policy. *Wilson Depo. 32:14 – 33:2.* A student had to declare one race or the other to participate. *See Wilson Depo. 124:13–17 ("Q. Now, if a person is neither black nor white, what category would they fall into under this 1996 procedure for homecoming at Cloverdale? A. That's no procedure that they would fall under. They have to be one or the other.")* Wilson says that the "racial quota" in homecoming elections was done "in order to give equal opportunity to both races." *Wilson Depo. 42.2–6.* Wilson did not think that there was a compelling reason to have the dual election system. *Wilson Depo. 47:13–17.* In fact, other activities at Cloverdale do not have a dual election system. *Wilson Depo. 36:2 – 39:15.*

Lovrich testified that Cloverdale did not use a racially-divided election system in 1994–95, but returned to that system after complaints from white children and one white parent. *Lovrich Depo. 10:17 – 15:17.* Eberhart, the school system superintendent, has affirmed that the Cloverdale employees were "vested with th[e] authority to conduct th[e] election as they saw fit." *Eberhart Depo. 105:6–12.* He made this statement in the context of discussing Principal Wilson, and teachers Bradford and Lovrich. *Eberhart Depo. 103:21 – 105:12.* Eberhart also testified that he had no knowledge of the system that individual schools used to select their homecoming queens. *Id. at 28:19 – 29:1.* He did not know of a compelling reason to have a dual racial classification. *Id. at 22:2–12.*

Mr. Charles Everett, the executive assistant to the superintendent, testified in deposition. He does not know that anyone on the superintendent's executive committee has a specific role to advise the superintendent regarding "racial classifications in the selection of students in extracurricular activities;" and states that he is not aware of any discussion regarding racial selection in extracurricular activities among the executive officers. *Everett Depo. 20:18 – 21:13.* Everett believes that the schools should operate a dual race selection system for extracurricular activities because such a system allows students to "feel a part of the school" as if they have an "ownership" in the school. *Everett Depo. 63:1–18.*

Mr. Clinton Carter is a part-time consultant to the superintendent. *Carter Depo. 5:8–11.* Carter was instructed to search the policies of the MCBOE to find if there was a policy relating to racial composition of homecoming courts; he stated that there was no such policy. *Carter Depo. 24:22 – 25:10.* The Board at one time had a policy which enforced a racial selection of cheerleaders. *Carter Depo. 28:11–23.* Carter knows of no policy which would have kept a principal from designing his own homecoming election system, even one which used race as a factor. *Carter Depo. 41:4–18.* He thinks that other schools may have had such policies. *Carter Depo. 41:19 – 42:1.* He does not know if there was a compelling reason for having such a system. *Carter Depo. 42:8–13.* Clo-

verdale has become progressively more minority over the past twenty years. *Carter Depo. 42:14–21.*

Defendants have presented evidence that the defendants have adjusted the school policy regarding selection and election of students for positions in response to the incident at Cloverdale. *Eberhart Depo. At 95:19 – 96:4.* Wilson has testified that, because of a resolution of the MCBOE, during future student elections, the schools "won't have a classification." *Wilson Depo. 133:2–6.* Eberhart appears uncertain of the exact effect of the new policy, however. *Eberhart Depo. 96:5–14.* The new policy is not legally relevant at this time, however, as the Defendants have raised no issues of standing or mootness in their present motion, and the scope of relief is not before the court. Therefore, the court is not required to make any determinations regarding the evidence presented on this issue.

### Involvement of the Media.

Evidence submitted represents that Godby and her parents voluntarily spoke with the media, including newspapers and television, about many aspects of the dispute. Godby described the facts in a Montgomery Advertiser article on October 12, 1996. *See "Mixed-race Girl Not on Ballot for Queen," Montgomery Advertiser, October 12, 1996.* In the article, Bethany described her feelings about the election system, which sometimes allowed white students to win "just because they were white." *Id.* She stated that she no longer wanted to be homecoming queen because of the election system. *Id.* Also in the article, Godby's father described his daughter's mental anguish, and his feelings that canceling the election would be unfair. *Id.* Statements by defendant Eberhart also imply that he saw Godby and her parents voluntarily appear on different media, including television. *Eberhart Depo. At 79:15 – 80:1.*

After the incident was brought to the attention of the media by the Godby family, the school decided that a response was necessary. The school held a press conference where Principal Wilson spoke. *Everett Depo. 43:8 – 46:3.* The Principal initially represented that the first election was nullified because of a counting problem; the young lady who won the position of black attendant had assisted in counting the ballots. *See Plaintiff's exh. 19 (press statement of Jethro Wilson).* He represented that when the second election was held, Godby simply did not receive the requisite number of votes in her homeroom to be put on the school-wide ballot. *Id.* Godby was not removed from the ballot. *Id.* Rather, she never made it on the ballot. *Id.*

### Investigation by the School.

Mr. Everett distributed a questionnaire to the students in Godby's homeroom class asking them about the incident. *Everett Depo. 51:3–11.* He recalls that the answers to the questionnaires were inconclusive as to the results of the first and second ballots in the homeroom. *Everett Depo. 54:22 – 55:17.* These questionnaires have been furnished to the court as part of their submission in opposition to the Defendants' motion for summary judgment, as Exh. 21. They are in fact inconclusive. Ten students stated that Godby was the winner of the second nomination by her homeroom; eleven were not sure; and four thought that another student had won. Although the court is apt to be suspicious of the results of a survey of ninth-graders taken by school officials with whom the students are not familiar, neither side has raised an objection to the admissibility of this evidence. In any event, there is also an affidavit from a fellow student of Godby, stating that Godby won the second election. *S. Blackwell Affid.*

### III. DISCUSSION

Plaintiffs have brought a number of claims in this suit, and have presented even more theories of liability. Plaintiffs appear to be a bit unsure, as are some of the school officials, of what the particular wrong is. Is the wrong the election that was 'stolen' from Godby? Or is the wrong that there was not a separate 'biracial' category? Or is the wrong that the school was operating a 'separate-but-equal' system for homecoming elections?

At least some of the school officials even appear to believe that an election based on separate racial categories is in the best inter-

est of students. Far be it from this court to second-guess school professionals on how best to educate children; nevertheless, even school officials must follow the law. Racial categorization by the government is unacceptable, even if it is done for supposedly 'good' reasons. The court sustains the central claim of Godby's suit-Plaintiff has presented a case of racial discrimination that should be heard by a jury. The court will dismiss some of the numerous claims and theories, however.

### Section 1983 Freedom of Association.

Plaintiff's first theory of liability is one for violation of her freedom of association rights. The court is hard-pressed to understand what Godby's freedom of association claim is in this case. Plaintiffs are apparently stumped by their claim as well. They neither defend nor object to the Defendant's motion for summary judgment on this ground.

It is no doubt true that the Supreme Court has recognized a right of association, closely tied to First Amendment Freedom of Speech. As stated by the Supreme Court:

> Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.

N.A.A.C.P. v. Alabama, 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Bethany Godby has presented no evidence that the MCBOE or its officials have prevented her from associating with any group or organization; nor has she even shown that she has participated in any group or organization with the purpose of advocating some point of view. Godby and her family could, perhaps, qualify as a group which is owed protection. See generally Moore v. City of East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (discussing substantive due pro-

cess rights of extended families to live in same household despite zoning ordinances). The Godbys have not presented the court any evidence of interference by the school board between Bethany and her parents, however. Because the Plaintiffs have not shown how they could have a claim for denial of freedom of association, the court grants summary judgment as to this count.

### Section 1983 Racial Discrimination (Individual Capacity / Qualified Immunity).

Discussion of Plaintiff's Section 1983 Equal Protection claim is divided into two sections. The court will deal separately with the Godbys' claims against the Defendants in their individual capacities and the Godbys' claims against the Defendants in their official capacities. This is done because of the presence of qualified immunity.

■ Qualified immunity is a protection designed to allow government officials to avoid the expense and disruption of trial. *Ansley v. Heinrich*, 925 F.2d 1339, 1345 (11th Cir.1991). An official is entitled to qualified immunity if he is performing discretionary functions and his actions do " 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1424 (11th Cir.1997). Courts are to follow a two-step analysis. First, the Defendants must show that they are performing an act within their discretionary authority. If that burden is satisfied, then it becomes the Plaintiffs' duty to prove that the Defendants violated clearly established law. *See, e.g., Sweatt v. Bailey*, 876 F.Supp. 1571 (M.D.Ala.1995).

■ *Discretionary Authority.* Plaintiff's response to the Defendants' motion for summary judgment on qualified immunity grounds focuses, in great part, on the Defendants' failure to argue that they were acting within their discretionary authority. This is generally an uncontested issue, so it is not surprising that the Defendants failed to discuss it in their motion for summary judgment. *See, e.g., Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1149 (11th Cir.1994) (skipping over issue of discretionary function

to discuss clearly established law); *see also Lancaster*, 116 F.3d at 1424 (noting that parties did not dispute whether act was discretionary function). In fact, the determination that an officer was acting within his discretionary authority is quite a low hurdle to clear. As noted by Judge Thompson in *Sweatt v. Bailey*, 876 F.Supp. at 1576, the burden is made so easy "because of the level of generality at which this requirement must be determined." An official may show that an act was within his discretionary authority merely by showing that the acts "(1) 'were undertaken pursuant to the performance of his duties,' and (2) were 'within the scope of his authority.'" *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir.1994) (finding that transporting prisoners and contracting with jails were part of discretionary duties of U.S. Marshals).

■ Defendants responded to this failure in their reply brief, and indeed furnished evidence that the school officials were acting within their discretionary authority. Mr. Wilson, as Principal, assigned Lovrich to direct homecoming; Mr. Bradford, as homeroom teacher, conducted an extracurricular activity; Superintendent Eberhart, talked with a Principal and investigated an incident. Indeed, it could not even be seriously contested that these employees were not acting within their discretionary authority. Certainly, it is within the scope and authority of school officials to schedule and conduct extracurricular activities. *See generally Green v. County School Board of New Kent Co.*, 391 U.S. 430, 435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) (listing "facets of school operation" as "faculty, staff, transportation, extracurricular activities," and student composition.). Students, in fact, generally consider it to be the most important duty that their teachers and leaders undertake.

■ Plaintiffs' only other argument against a finding that these officials were acting within their discretionary authority is a theory that the Defendants could not have been acting within their discretion because they had no discretion to racially discriminate. The Plaintiffs do not cite any cases for this proposition; and indeed, none could be cited. A defendant is not failing to act within

his discretion merely because he or she is doing something unlawful. Indeed, if that were the test, why would the court even need to confront the issue of clearly established law? The two steps would be merely conflated into one. It is perfectly logical for a court to find that someone who was acting illegally was acting within his discretionary authority. That is why the court is called upon to decide if the official violated clearly established law (after the court finds the official was acting within his discretionary authority). *See Sweatt*, 876 F.Supp. at 1576 ("[P]olice officers must perform the duty of controlling persons after arrest ... This is not to condone the use of profanity and unnecessary force. However, these alleged acts are more properly considered in the second step of the test ...").

*Clearly established law.* In order to defeat qualified immunity for officials who are acting within their discretionary authority, the Plaintiffs must show that the officials were violating clearly established law. Much of the Plaintiffs' discussion of "clearly established law" tries to point out the error of the Eleventh Circuit in *Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821 (11th Cir. 1997). There, the Eleventh Circuit reaffirmed the *Lassiter* doctrine: that the previous case must be factually on all fours with the present situation for qualified immunity to not apply. Or, as put in *Lassiter*, the law must have "earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors in the defendant's place, that 'what he is doing' violates federal law." *Lassiter*, 28 F.3d at 1149. The analysis does not focus on analogies. Rather, the analysis "focuses on the actual, on the specific. on the details of concrete cases." *Id.* at 1149–50.

■■ As the Plaintiffs point out, the requirement to deny qualified immunity is not one of "factual rigidity," *Nicholson v. Georgia Dept. of Human Resources*, 918 F.2d 145, 147 (11th Cir.1990). Nevertheless, there is a strong burden of similarity. A "government agent's act [must be] so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law" would engage in

it. *Lassiter*, 28 F.3d at 1149. To not require this would be to allow the Plaintiffs to "discharge their burden" of defeating qualified immunity by "referring to general rules and to the violation of 'abstract' rights." *Id.* at 1150. Plaintiffs have made no attempt to show this court any case which is remotely on factual all fours with this case; they in fact concede that none exists. The court has not been able to find one on its own, either.

Plaintiffs are not conceding that qualified immunity applies in admitting that there is an "absence of 'detailed guidance' from the Eleventh Circuit," or anyone else, on this issue, however. *Plaintiff's Brief at 23.* Rather, the Plaintiffs argue that the present case is one of those cases where a reasonable public official should have known that his conduct was unconstitutional even without a factually-similar precedent. Plaintiff is relying on discussion in *United States v. Lanier,* 520 U.S. 259, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). *Lanier* notes, in holding that the legal standard is that the "unlawfulness must be *apparent* in light of pre-existing law," *Jenkins,* 115 F.3d at 826 n. 3, that "[t]he easiest cases don't even arise." *Lanier,* 117 S.Ct. at 1227, quoting *U.S. v. Lanier,* 73 F.3d 1380, 1410 (6th Cir.1996) (Daughtrey, J., dissenting). As an example of such easy cases where there would be no immunity despite the absence of a factually similar precedent, the Supreme Court gave: "a section 1983 case accusing welfare officials of selling foster children into slavery." *Id.*

The court is not sold on Plaintiffs' argument. A slavery case would, indeed, be easy, especially given the clear text of the Thirteenth Amendment. The Fourteenth Amendment is not quite as clear as its immediate predecessor, however. The language is of rather open-ended formulas, in this case, "equal protection," (which was not even a legal formula or term prior to the enactment of the Amendment). And, indeed, the judicial construction of discrimination, and approval of affirmative action, is known to be rather fluid, even at the level of the Supreme Court. *See Metro Broadcasting, Inc. v. Federal Comm. Comm'n,* 497 U.S. 547, 564–66, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (approving racial set asides and other "benign racial classifications" by the FCC if calculated to serve "important governmental objective[s]"), *overruled in Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (striking down racial set asides in government contracts because they were not narrowly drawn to further a "compelling state interest").

■ Members of the general public cannot often distinguish between legally acceptable discrimination, such as that for pure remedial purposes, and unacceptable discrimination. Both types of discrimination are, after all, administered by the government; the first generally by the federal courts, and the second usually by other branches or authorities. Confusion regarding the legality of discrimination and 'reverse discrimination' by public entities could even be justified given the history of school desegregation litigation, which involves repeated instances of federal decrees which speak in terms of explicitly race-based remedies. *See, e.g., United States v. Montgomery County Bd. of Educ.,* 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969) (affirming order of district court which set ratios for hiring of black and white teachers). Confusion may also be exacerbated by the retention of programs which were meant initially to serve a remedial purpose in desegregating the schools, *see, e.g., Young by and through Young v. Montgomery County (Ala.) Bd. of Educ.,* 922 F.Supp. 544, 546–47 (M.D.Ala.1996) (noting that school board voluntarily maintained majority-to-minority transfer program which had originally been instituted as part of court order to desegregate), and by the confusing and willful handling of the issues of discrimination by some federal courts, *see, e.g., Coalition for Economic Equity v. Wilson,* 946 F.Supp. 1480 (N.D.Cal.1996) (preliminarily enjoining enforcement of California Proposition 209—which was passed by state voters and barred racial discrimination and preferential treatment in terms parroting Supreme Court analysis—because the Proposition would not allow state to engage in affirmative action), *vacated* 122 F.3d 692 (9th Cir.1997) (vacating injunction, noting a ban on affirmative action would be constitutional as the Fourteenth Amendment "does not require what it barely permits"), cert. denied ——

U.S. ——, 118 S.Ct. 397, 139 L.Ed.2d 310 (1997); *compare Hopwood v. State of Texas,* 78 F.3d 932, 934 (5th Cir.1996) (declaring admission preferences for minority students unconstitutional even if done for the allegedly "wholesome purpose of correcting perceived racial imbalance in the student body"), cert. denied 518 U.S. 1033, 116 S.Ct. 2581, 135 L.Ed.2d 1095 (1996) with *Hunter by Brandt v. Regents of the Univ. of Cal.,* 971 F.Supp. 1316 (upholding racial and ethnic admission criteria for elementary school run by University).

▮ Plaintiffs also argue that the Defendants would have been made aware of this clearly established law because of the existence of MCBOE policy. It is not the existence of instructions from one's employer which determine clearly established law, however. It is the "law" which must be "clearly established" in order to deny qualified immunity to a public official, not some school policy. *Lassiter,* 28 F.3d at 1149.[3] Further, the existence of clearly established *law* is established by "case law" which sets "bright lines," not "abstractions." *Id.* at 1150. The written policy of the MCBOE is not much more concrete than the Fourteenth Amendment itself.[4]

Defendants can be entitled to qualified immunity for performing acts which are shocking to some degree. *See Jenkins,* 115 F.3d at 822–23 (discussing strip search of children by school officials). Nevertheless, the law has found it necessary to protect public officials from the threat of litigation, except in those cases where they are violating clear law which was established in a situation factually similar to their own. "[P]re-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances,*" in order for qualified immu-

nity to be denied. *Lassiter,* 28 F.3d at 1150. The court does note that if its finding, discussed below, that MCBOE officials were violating the Constitution is affirmed by the Eleventh Circuit, then future officials in similar circumstances would not be entitled to qualified immunity. The officials in the present case, however, are. Plaintiff has not shown that this is such an "exceptional case" to override the "usual rule" of qualified immunity protection for government officials. *Lassiter,* 28 F.3d at 1149.

### Section 1983 Racial Discrimination (MCBOE, Official Capacity).

▮ Plaintiffs' § 1983 claims are not filed against defendants Lovrich, Bradford, Wilson, and Eberhart in their individual capacity only. Plaintiffs have also sued Lovrich, et al., in their official capacities and sued the MCBOE as an entity. Among these claims, the court need only confront the claim against the MCBOE as an entity. Claims against officers in their official capacity are "functionally equivalent" to claims against the entity that they represent. *Busby v. City of Orlando,* 931 F.2d 764, 776 (11th Cir .1991). To retain this suit as one against Lovrich, et al., in their official capacity and as one against the MCBOE would be "redundant and possibly confusing to the jury." *Id.* The court, therefore, dismisses the § 1983 discrimination claims against Lovrich, Bradford, Wilson, and Eberhart, in their official capacities. *See Id.* (affirming directed verdict as to official capacity defendants where city remained as defendant). The court will address the § 1983 claim as one against the MCBOE only.

▮ There is, of course, no respondeat superior liability under § 1983. *Monell v. Dept. of Social Serv.,* 436 U.S. 658, 690–92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Floyd v. Waiters,* 133 F.3d 786, 793 (11th Cir.1998).

---

**3.** Plaintiffs are attempting to have it both ways with this policy. They argue that it was clear enough to put the officials on notice that what they were doing is unconstitutional. On the other side, however, they argue that the official policy or custom of the MCBOE is one of discrimination, in light of the vagueness of the policy. Plaintiff cannot have it both ways.

**4.** The policy states: "No person shall be denied employment, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in any program or activity on the basis of handicap, sex, race, religious belief, national origin or ethnic group, color, or age." *Mont. Public Schools Policy JAA ("Equal Education Opportunities"), Nov. 11, 1989.*

The School Board can only be held liable, therefore, if the homecoming election was unlawful and was conducted pursuant to its official policy or custom. *Monell,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The issue of the legality of the voting system is addressed below. First, the court must address if the MCBOE had an official policy or custom for which it could be held liable.

*Official Policy or Custom.* Proving an official policy of the MCBOE to run a biracial election system is particularly challenging.[5] There are generally three ways to prove such liability. One, the MCBOE could be shown to have adopted a written policy of such elections. Two, the official policy of the MCBOE in favor of such elections may be determined by the actions of a final policymaker. Finally, there may be a custom of such elections, for which the MCBOE is legally responsible.

The easiest way to establish liability of the MCBOE would be to show a written policy favoring biracial elections-to show that such elections were "officially sanctioned or ordered." *Floyd v. Waiters,* 133 F.3d 786, 793 (11th Cir.1998). In the present case, there is no evidence that the Board somehow "officially sanctioned or ordered" this conduct. Rather, the Board appears to have a policy which might be said to ban the elections, although that policy is ambiguous at best.[6] In any event, there is no easy-to-find written policy in favor of such elections.

▮▮▮▮ "Official Policy" liability need not be based solely on the what the school board adopts as its "policy" in a legislative-type process, however. Rather, policy may also be made through the actions of a school board official who " 'possesses the authority and responsibility for establishing *final* policy with respect to the official in question.' " *Floyd,* 133 F.3d at 794, quoting *Mandel v. Doe,* 888 F.2d 783, 793 (11th Cir.1989) (em-

phasis in original). The mere fact that an employee of the MCBOE, however, has some "discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Floyd,* 133 F.3d at 794. Indeed, if the employee's actions are still "constrained by official policies" or "subject to meaningful administrative review," then the employee cannot fairly be said to be a final policymaker. *Id.* Those who are charged with the status of final policymaker, however, may set official policy for the MCBOE with only one act. *Morro v. City of Birmingham,* 117 F.3d 508, 510 (11th Cir. 1997), petition for cert filed 66 USLW 3399 (Nov. 25, 1997).

▮▮▮▮ The identification of the final policymaker is a question of state law to be determined by the court. *Id.* The only guidance given to the court by the Defendants on this issue is a citation to Ala.Code Ann. § 16-1-30(b). That section states that the "local board of education shall, upon the written recommendation of the chief executive officer, determine and establish a written educational policy for the board of education and its employees and shall prescribe rules and regulations for the conduct and management of the schools." The statute goes on to place certain notice and publication standards on the board. Defendants argue that this statute makes the board the only policymaker for the school. The statute does not, however, make the board the sole authority for any policy. The statute merely requires the Board to make written policies. The Defendants' arguments are not such that summary judgment could be granted on that basis.

Indeed, the Alabama Code, as noted by the Plaintiffs in a special supplemental brief requested by the Court regarding *Floyd v. Waiters,* 133 F.3d 786 (11th Cir.1998), directed the court's attention to two other statutes. Ala.Code. Ann. § 16-8-9 states that the

---

5. The real question in this suit is not: what is the policy? The question is, instead, whether the 'policy' (i.e., running a biracial election system, forcing students into categories of "black" or "white") is an official policy or custom of the MCBOE. No one disputes that there was a biracial election system at Cloverdale. The Defendants do dispute whether Lovrich wrongly

removed Godby from the white ballot. The enforcement of a strict "white" or "black" status is really, however, merely a consequence of the existence of the system itself.

6. The policy is quoted in footnote 4.

"county board of education shall exercise through its executive officer, the county superintendent of education and his *professional assistants* control and supervision of the public school system of the county ..." (emphasis added). Further, Ala.Code Ann. § 16–9–13 states that the "county superintendent of education, as the executive officer of the county board of education, shall see that the laws relating to the schools, the rules and regulations of the state and county boards of education are carried into effect ..." From these statutes at least "control" may pass to those below the MCBOE, and the superintendent even has authority to interpret "laws" and not just the written policy of the board. Nothing in these statutes sets the superintendent, or principal, or Holli Lovrich as the official policy-maker for homecoming; nothing prevents them from being it, either.[7] Indeed, nothing in the Alabama Code mentions homecoming or extracurricular activities for county boards of education.[8] Suffice it to say, Defendants have not shown that summary judgment is due because the MCBOE is the only policymaker for Cloverdale under Alabama law. Alabama law allows others to make policy for the schools. *See Arnold v. Board of Educ. of Escambia County, Ala.,* 880 F.2d 305, 316 (11th Cir. 1989) (holding that allegation that school guidance counselor was final decisionmaker was sufficient to withstand a motion to dismiss).

■ In addition, the facts which are before the court also do not establish that the MCBOE was an exclusive policymaker in this case. Superintendent Eberhart said that the school principals may run homecoming, and his assistants knew of the policy, with at least one encouraging it. What we are dealing with in this case is apparently a grant by the MCBOE to the individual school authorities to direct extracurricular activities as they wish. Lower level employees may be designated as official policymakers for some purposes. Parker v. Williams. 862 F.2d 1471, 1478 (11th Cir.1989) ("authority may be granted directly, or the authority may be delegated by an official having the power to do so"); *See Martinez v. City of Opa–Locka, Fla.,* 971 F.2d 708, 713–715 (11th Cir.1992) (city manager, instead of commission, was policymaker for city regarding personnel matters for certain employees); *Brown v. Crawford,* 906 F.2d 667, 671 (11th Cir.1990), cert. den. 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991) (even in cases involving only "unconstitutional acts of low-level municipal employees," custom or policy may be proven). In addition, the single decision of a final policymaker may be the official policy of the city for purposes of § 1983 liability. *Martinez,* 971 F.2d at 713; *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

■ The actions in this case were taken with the blessing of the superintendent for the school officials to conduct homecoming as they wish. Further, evidence is also presented that Principal Wilson designated Holli Lovrich as his captain of homecoming, for her to run it. In deciding who is the repository of MCBOE authority in this case, the court will be guided by the "substance of an official's authority over a particular matter, rather than the technical allocation of responsibility under state law." *Parker v. Williams,* 862 F.2d at 1478. The substance of this matter is apparently that Wilson, as Principal, was allowed to run extracurricular activities as he wished. He knew of the biracial elections and allowed them to continue. Perhaps, he even reinstituted them. Lovrich was designated by him to take charge of homecoming. She ran it as it had

---

7. In *Floyd,* a Georgia board of education was determined to be the only maker of policy for its schools. Georgia law states, however, that the board does have such exclusive rights and that the board has no authority to delegate those rights. 133 F.3d at 794. The court has not been directed to, nor has it discovered, any such comparable provision of Alabama law.

8. The only Alabama laws referencing extracurricular activities have to do with the special schools, the Alabama School for the Fine Arts, and the school for Mathematics and Science. Two of the statutes, Ala.Code Ann. §§ 16–26A–6 and 16–26B–7, merely state that those schools should endeavor to have the same sorts of extracurricular activities as other schools. The third, Ala. Code Ann. § 16–26A–4, merely tells the board of the school of Math and Science to "determine subjects and extracurricular activities to be offered."

been done. Her activities in removing Godby from the white ballot are, apparently, merely a necessary administrative duty. When one runs a biracial system, one must have some basis to distinguish between the races.

The law and the evidence point, therefore, toward a legal determination that someone below the level of the Board or Superintendent is the final policymaker regarding Cloverdale's homecoming. Probably, that person would be Principal Wilson, who has the last word at his school; and, for all practical purposes, the last word at all. The information before the court is not sufficient, however, to make a complete determination at this time. The court will reserve its determination of who is the final policymaker until trial.

The court does caution that two lines of evidence could be developed to absolve the MCBOE of authority for these actions. First, some references have been made to the oversight duties of the board. "[M]eaningful administrative review" may be a basis for deciding that a lower-level official, such as Wilson or Lovrich, is not an official policymaker. *Floyd,* 133 F.3d at 794. Further, it is the possibility of this review, not the automatic nature or actual occurrence of such review, which is important. *See Scala v. City of Winter Park,* 116 F.3d 1396, 1402 (11th Cir.1997). Most of the cases invoking this principle arise in employment circumstances where the decision to fire an employee could be reviewed by a personnel board. *See Morro,* 117 F.3d at 514 (and cases cited therein). Nevertheless, the principle is of more general application. *See Scala v. City of Winter Park,* 116 F.3d 1396, 1401 (11th Cir. 1997) (discussing principle without limiting it to employment circumstances). In addition, there must be more than a "mere delegation of authority to ... exercise discretion" to

Lovrich or Wilson, in order to find that they are policymakers. The court simply has not been given enough information to decide if summary judgment is appropriate on these bases. *See, e.g., Brown v. City of Ft. Lauderdale,* 923 F.2d 1474, 1480 (11th Cir.1991) ("district court on remand will need to consider all available evidence of policymaking authority before deciding the issue of municipal liability"). That is why it is due to be denied at this time.[9]

■ Even if the Plaintiffs could not prove that a final policymaker has bound the MCBOE, they still may be able to show that a legally-binding custom has been established. Under this theory, a defendant may be held liable for certain "long-standing and widespread practices," provided that the practices are so "permanent and well settled" that they are "deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Floyd,* 133 F.3d at 795, quoting *Brown v. City of Ft. Lauderdale,* 923 F.2d at 1481. The custom must actually lead to the "deprivation of the Plaintiffs' federal rights." *Floyd,* 133 F.3d at 795.

■ In the present case, there is evidence that the use of biracial elections is a long-standing and widespread practice. Principal Wilson testified that it was ongoing when he became Principal at Cloverdale. An assistant to the Superintendent testified to the decades-long nature of the practice, and of his thoughts regarding the benefit of the practice. Lovrich also testified that it had been stopped one year, but that students had become so familiar with it that their parents demanded its return. Defendants have not shown that summary judgment can be granted in these circumstances.

9. The question whether someone is a final policymaker or not, is a question for the court, not the jury. *Morro,* 117 F.3d at 518. If this case proceeds to trial, the court will, therefore, have to decide who is the final policymaker in this case. It will be for the jury to decide whether the decisions of these policymakers caused a deprivation of a constitutional right, however. *Jett v. Dallas Ind. School Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 ("Once those offi-cials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity.")

While the court allows this claim to go forward regarding the "official policy or custom" of the school, the court does note the invalidity of one argument made by Plaintiffs. Plaintiffs state that the MCBOE adopted or ratified the conduct of the Cloverdale employees, and therefore, is liable for that discrimination. This theory is not made clear (indeed, the Plaintiffs' entire discussion of "official policy or custom" is short and fails to inform the court as to the real theory advanced). Nevertheless, in response to this undeveloped argument, the court would note that "the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority." *Floyd*, 133 F.3d at 794, quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 129, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Therefore, to the extent that the Plaintiffs are attempting to hold the MCBOE liable for not exploring these matters in a more hurried fashion once they became public, that theory would be improper. *See also Hill v. Clifton*, 74 F.3d 1150, 1152 (11th Cir.1996) ("city may be held responsible where the authorized policymakers 'approve a subordinate's decision *and the basis for it.*' "), cert. den. —— U.S. ——, 117 S.Ct. 51, 136 L.Ed.2d 15 (1996).

In sum, the court notes that it has had a great deal of trouble fully addressing this matter of official policy or custom. The Defendants in their brief in support of summary judgment noted the general law on this matter and challenged the Plaintiffs' case. The Defendants did so. however, primarily by challenging whether the Plaintiffs had stated a claim for violation of the Constitution. Defendants did not adequately address the lack of an official policy or custom. Plaintiffs responded, and argued that the Defendants did have an official policy or custom. This argument was likewise cursory, however. Defendants did reply and argue, using some facts, that there is not an official policy or custom. Defendants' reply, is, however, that the MCBOE .is the only entity which can make policy. This argument is simply too undeveloped, and too contradicted by other law and evidence, to be a basis for summary judgment. Further exploration at trial may bear out that the discrimination here was not the act of the MCBOE, either because no final policymaker approved it, or because it was not a custom. At this time, that seems doubtful, however. The court may not award summary judgment on this basis.

*Equal Protection.* Although the Supreme Court has been somewhat divided, and slow, in developing the law of racial preferences, this court believes that the law now bars the racial distinctions made by the MCBOE in its homecoming nominations. The Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." Although the language of the Amendment is somewhat vague-after all, for almost 100 years, the Supreme Court read it to allow government-mandated segregation-the principles that it stands for have ultimately been put into focus. As stated by Justice Kennedy, it is the "moral imperative of race neutrality [that] is the driving force of the Equal Protection Clause." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 518, 109 S.Ct. 706, 102 L.Ed.2d 854 (Kennedy concurring). Government racial categorization, for little or no reason, cannot stand.

It has long been established that laws which discriminate against persons because of their race are unconstitutional unless there are exceptional circumstances. During World War II, the Supreme Court addressed curfews which applied only to Americans of Japanese ancestry. The Court upheld the curfews during that peculiar time, but noted, even then, that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States*, 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). Distinction between individuals based on their race has been long recognized by the law to be "in most circumstances irrelevant and therefore prohibited." *Id.; see also Adarand*, 515 U.S. at 214 (discussing cases applying doctrine of equal protection to decisions of federal government). In the words of modern constitutional analysis, classification by race or any "race-based action" by government can only be sustained when it "is necessary to further

a compelling interest" and when it is "narrow[ly] tailor[ed]" to meet that purpose. *Adarand,* 515 U.S. at 237.

 It does not matter, as is apparently suggested by the Defendants, that the categorization in this case applied to everyone.[10] Indeed, it is "racial classification" itself which is one of the main evils that the test of judicial strict scrutiny seeks to ferret out, and destroy. *See Adarand,* 515 U.S. at 229. Even when done for a supposedly "benign" purpose, such classification creates a number of presumptions and assumptions, causing people to believe "that those who are granted this special preference are less qualified in some respect that is identified purely by their race." *Id.* Granted, this court is not clear on what the 'qualifications' are for homecoming queen, or what particular talents, other than popularity, Cloverdale school seeks to recognize. Even in the context of something as relatively minor as a junior high homecoming election, however, the pernicious nature of racial distinctions by the government is not wiped away. All such distinctions delay "the time when race will become a truly irrelevant, or at least insignificant, factor;" exacerbate racial identity; and feed racial hostility and prejudice. *Id.*

It has taken the Supreme Court longer to confront laws which are designed to benefit members of a race who were formerly disadvantaged, so called "affirmative action" or "reverse discrimination." The Court's first confrontation with the issue, *Regents of the Univ. of Cal. v. Bakke*[11] ended in a stalemate with the Court producing no opinion whether the University of California could reserve spaces for minorities in its medical school. *See Adarand,* 515 U.S. at 218 (establishing

that federal government could engage in racial preferences for minorities only if such preferences serve a compelling government interest). Later cases, *Fullilove v. Klutznick* in 1980[12] and *Wygant v. Jackson Bd. of Educ.* in 1986[13] likewise failed to produce a standard to be applied to such reverse discrimination. *See Adarand,* 515 U.S. at 219–20.

*Wygant* did serve, however, to at least strike down a racial preference in lay-offs. Four Justices voted to strike down the preference because of its failure to meet with strict scrutiny, finding that the "level of scrutiny does not change merely because the challenged classification operates against a group that historically has not been subject to governmental discrimination." *Wygant,* 476 U.S. at 273. The plurality found that the school board could not show a compelling state interest to favor one race merely because it wanted to "provid[e] minority role models for its minority students, as an attempt to alleviate the effects of societal discrimination." *Id.* at 274. "Societal discrimination, without more," was determined to be "too amorphous a basis for imposing a racially classified remedy." *Id.* at 276. Nevertheless, the Supreme Court still failed to produce a clear opinion in *Wygant.* One Justice concurred only the judgment of the Court; four dissented. *See Adarand,* 515 U.S. at 220–21.

In *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), a consensus was finally reached, at least with regards to affirmative action by entities other than the Congress. In that case, a majority held that " 'the standard of review under

---

10. Plaintiffs cite for this proposition *James By and Through Singleton v. Tallassee High School,* 907 F.Supp. 364, 367 (M.D.Ala.1995) (De Ment), *aff'd* 104 F.3d 372 (11th Cir.1996), which states that a plaintiff in an equal protection case must show "that she was treated differently than other who were similarly situated." This statement of Judge De Ment was not meant to encompass all of equal protection law. If the court were to read it as Defendants suggest—i.e., all students at Cloverdale were subject to the racial classification, therefore it is allowable—the court would have to ignore decades of Supreme Court precedent. *See Loving v. Virginia,* 388 U.S. 1, 8, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) ("we reject

the notion that the mere 'equal application' of a statute containing racial classifications is enough to remove the classifications from the Fourteenth Amendment's proscription of all invidious racial discriminations . . .").

11. 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)

12. 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980)

13. 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986).

the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification,' and that the single standard of review for racial classifications should be 'strict scrutiny.'" *Adarand*, 515 U.S. at 222, quoting *Croson*, 488 U.S. at 493–94, 520. A majority further held that the program in front of it-a reservation of 30% of the city's contracting work for minority-owned businesses-was adopted without a "'strong basis in evidence for its conclusion that remedial action was necessary.'" *Adarand*, 515 U.S. at 222, quoting *Croson*, 488 U.S. at 500. And that the program was "'not narrowly tailored to remedy the effects of prior discrimination.'" *Adarand*, 515 U.S. at 222, quoting *Croson*, 488 U.S. at 508.

▉ Given the uncertainty of the status of affirmative action by states prior to Croson (and the continuing uncertainty of action by the federal government), the Supreme Court found it necessary to (again) establish the general law regarding "governmental racial classifications" in 1995. *Adarand*, 515 U.S. at 223. The principles, as re-stated, are:

First, **skepticism:** 'Any preference based on racial or ethnic criteria must necessarily receive a most searching examination,' . . .

Second, **consistency:** '[T]he standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification,' . . . i.e. all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized.

And, third, **congruence:** 'Equal Protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.' . . .

Taken together, these three propositions lead to the conclusion that any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the **strictest judicial scrutiny.**

*Adarand*, 515 U.S. at 224 (internal citations omitted; emphasis added).

It is of much assistance to this court that the standards for benign racial discrimination and other minority-focused discrimination, have converged. For one thing, the court does not have to go through the illusory, indeed impossible, task of determining whether the present discrimination is "benign" in nature. As noted by the Supreme Court in *Adarand*, any attempts to define this concept are troubling at best. *Adarand*, 515 U.S. at 225 (In affirming benign discrimination in *FCC*, "The Court did not explain how to tell whether a racial discrimination should be deemed 'benign,' other than to express confiden[ce] that an 'examination of the legislative scheme and its history' will separate benign measures from other types of racial classifications."). In addition, this court is unsure whether a racial distinction of any type can truly be determined to be benign. Indeed, all such governmental classification reinforces the idea of differences based on nothing more than skin color, and the idea that people should be treated differently because of some group to which they belong. *See Adarand*, 515 U.S. at 227 (stating that the Constitutional principle of equality protects individuals, not groups, and that all group classifications based on race are subject to strict scrutiny).

Finally, the court also notes that it would not know what to term this particular voting system: discrimination or reverse discrimination? From the assertions of counsel, it was apparently instituted to smooth the transition into integrated schools during the 1960s. School authorities cannot rely on its institution at a time when it arguably may have been needed, however, to justify its existence today. Further, the schools would apparently not know what justification to offer. Official after official testified that he knew of no compelling justification for its existence. Indeed, the attorneys for the defendants have not offered one, either.

▉ The only reasons given for the existence of the voting system are troubling at best. For one thing, the evidence is anecdotal, which can "suffice" on its own to justify governmental discrimination "only in the rare case." *Engineering Contractors Ass'n of South Fla., Inc. v. Metro., Dade County,*

122 F.3d 895, 925 (11th Cir.1997) (declaring race and sex preferences in government contracts unconstitutional), petition for cert. filed —— U.S. ——, 118 S.Ct. 1186, —— L.Ed.2d —— (1998). The problems with the evidence are not limited to its form, however. There are also serious difficulties with the substance. The evidence offered by the MCBOE is-*itself*-evidence of racial discrimination by the school. One school official testified that the voting system was reinstituted at the insistence of white students, and their parents, who now constitute a small minority at the school. That would make it something like reverse-reverse-discrimination, whatever that may be. In any event, it is not legal. Another explanation offered justifies the voting system as a benefit to all students, to help the students find a role model, or leader, of their own race. This role model theory was discussed, and dismissed, by a plurality of the Supreme Court in *Wygant.* Since then, the Court has made it clear that reverse discrimination cannot be practiced by the government for generalized reasons, or for the purpose of combating societal discrimination. *Croson,* 488 U.S. at 498 ("Like the 'role model' theory employed in *Wygant,* a generalized assertion that there has been past discrimination ... provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy.")

■ In any event, however, there is only one standard by which to judge this action of the MCBOE. Government in the United States—be it "federal, state, or local governmental actor"—"may treat people differently because of their race only for the most compelling reasons." *Adarand,* 515 U.S. at 227. Racial "classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Id.* Defendants in this case have tried little, if anything, to defend the racial quotas, and the racial voting system, at issue. All they have offered does not even come close to being the "strong basis in evidence" that is necessary in order for the court to sustain racial classification by a government entity. *Croson,* 488 U.S. at 500, quoting *Wygant,* 476 U.S. at 277. Simply put, when a government body "chooses to employ a suspect classification, it can-

not rest upon a generalized assertion" of necessity or the benign nature of the classification. *Croson,* 488 U.S. at 500. A good defense—indeed, a compelling, narrowly tailored defense—must be raised. It simply has not been here.

■ Indeed, one can make a fine argument that the Supreme Court would only sustain racial discrimination by government—i.e., view it as satisfying strict scrutiny—where it is done to "remedy ... a past wrong." *See Croson,* 488 U.S. at 511 (Stevens, concurring). No defenses of that kind, or of any other kind, have been raised by the Defendants. Further, even if they were, it would be impossible to show that this classification is narrowly tailored to any purpose. The classification paints only with the broad brush of black and white, ignoring any subtleties. In order to find the program to be "narrowly tailored" in the constitutional sense, the court would have to consider:

> (1) the necessity for the relief and the efficacy of alternative remedies; (2) the flexibility and duration of the relief, including the availability of waiver provisions; (3) the relationship of numerical goals to the relevant [student population]; and (4) the impact of the relief on the rights of innocent third parties

*Engineering Contractors Ass'n,* 122 F.3d at 927. No evidence has been presented that the MCBOE even considered this program to be a remedy for any problem, much less that the MCBOE considered the scope of this remedy, or any of the other factors found to be important by the Eleventh Circuit in narrowly tailoring a remedy. Apparently, MCBOE would have let the system continue uninterrupted, but for this unfortunate incident. That is perhaps the fate for governmental discrimination which is based on nothing more than an assumption of societal discrimination. The "remedy," such as it is, is "afforded no logical terminus." *Peightal v. Metropolitan Dade County,* 26 F.3d 1545, 1553 (11th Cir.1994). Governmental discrimination becomes a supplement to, and party to, societal discrimination.

As Justice Scalia noted in his concurrence in *Croson,* the "difficulty of overcoming the

effects of past discrimination is as nothing compared with the difficulty of eradicating from our society the source of those effects which is the tendency ... to classify and judge men and women on the basis of their country of origin or the color of their skin." *Croson,* 488 U.S. at 520 (Scalia, concurring). In this case, Cloverdale school has engaged in a practice of racially classifying students for purposes of extracurricular activities, and perhaps enforcing a rigid racial system which considers all (partial) non-whites to be "black." Summary judgment in favor of the Defendants is in no way due on this claim.

*Conclusion.* Although matters are somewhat undeveloped in the parties' briefs, the court can conclude that the § 1983 claim against the MCBOE should proceed at this time. There is still a question of state law to be determined by the court: specifically, who is the final policymaker for the Board regarding homecoming? In addition, there are further questions whether the policymaker caused a deprivation or whether there is a custom of discrimination. These questions may be resolved later. One matter is relatively clear, however. The election system used is a violation of the Constitution. That last element, and the present uncertainty over the liability of the Board, direct the court to deny summary judgment on this claim.

***Section 1981.***

■ Where the defendants to a suit are state actors, § 1981 claims merge into § 1983 claims. *Moore v. State of Alabama,* 989 F.Supp. 1412 (M.D.Ala.1997) (De Ment, J.)

As stated by the Eleventh Circuit, "The Supreme Court has ruled that 'the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.'" *Pearson v. Macon–Bibb County Hosp. Auth.,* 952 F.2d 1274, 1278 n. 3 (11th Cir.1992), quoting *Jett v. Dallas Ind. School Dist.,* 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Stated alternatively, "section 1981 can provide no broader remedy against a state actor than section 1983." *Busby v. City of Orlando,* 931 F.2d 764, 771–72 n. 6 (11th Cir.1991). Because § 1981 provides no different remedy than § 1983 and since they merge into one another, the court need provide no further analysis on this point. It is treated exactly like the § 1983 claim. This claim is merged into the § 1983 claim, and treated as a single claim.[14]

***Section 1985.***

■ Section 1985(3) provides a cause of action against conspirators who engage in one of several enumerated types of conspiracies to interfere with civil rights and thereby injure a person in his person or in his property or deprive a person of having or exercising any right or privilege of a citizen of the United States. 42 U.S.C. § 1985(3). The elements of a cause of action under Section 1985(3) are

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy;

14. There is at least one case from the Eleventh Circuit which suggests that dismissal is the appropriate remedy for a duplicative cause of action. In *Ebrahimi v. City of Huntsville Bd. of Educ.,* 114 F.3d 162 (11th Cir.1997), the Eleventh Circuit referred to plaintiff's claims as "shotgun notice pleading" where plaintiff brought claims against a school board and several individuals under sections 1981, 1983, 1985, Title VII, and Title IX. *Id.* at 165. The court's ultimate decision was to refuse an interlocutory appeal regarding District Judge Hancock's attempts to "impose some order on [the plaintiff's] unwieldy complaint" (Judge Hancock had dismissed a number of claims). *Id.* In refusing the interlocutory appeal, the Eleventh Circuit noted the "the similarity of the relief sought in the

dismissed" § 1981 and § 1985 claims and the retained § 1983, Title VII, and Title IX claims. *Id.* at 167. Relief under the dismissed claims would probably be foreclosed by relief under the retained claims. *Id.* In effect, Judge Hancock had only dismissed claims which were duplicative, and it would not be in the interest of "judicial administration" for the Eleventh Circuit to review those efforts in an interlocutory appeal. *Id.* Although the Eleventh Circuit does not necessarily affirm Judge Hancock's dismissal of duplicative causes of action, it does imply that dismissal is the appropriate response by a District Judge. Where the claims have merged, however, it is not necessary for this court to dismiss them on that basis. The court need only treat them as a single claim as it has.

(4) whereby a person is injured in his person or his property or deprived of any right or privilege of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828–829, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *Lucero v. Operation Rescue of Birmingham,* 954 F.2d 624, 627–28 (11th Cir.1992).

■ Summary judgment on the conspiracy claim in this case may be granted as a matter of law. It is legally impossible for the alleged conspirators to have conspired with one another. As recently noted by Judge De Ment in *L.Q.A. By and Through Arrington v. Eberhart,* 920 F.Supp. 1208, 1228–30 (M.D.Ala.1996), aff'd. 111 F.3d 897 (11th Cir. 1997), a claim of "conspiracy between the MCBOE and its employees ... is not cognizable" because of the intracorporate conspiracy exception. *Id.* at 1229. The alleged conspirators in Judge De Ment's case included a teacher and a principal at a Montgomery County junior high school. *Id.* at 1229, 1214. The theory is that school board employees are parts of the same legal entity and, therefore, cannot conspire with one another.

Judge De Ment's decision is consistent with and relies on a number of decisions from other circuits. *See Hilliard v. Ferguson,* 30 F.3d 649, 653 (5th Cir.1994) ("a school board and its employees constitute a single legal entity which is incapable of conspiring with itself for the purposes of § 1985(3)"); *Hull v. Cuyahoga Valley Bd. of Educ.,* 926 F.2d 505, 509–10 (6th Cir.1991) ("In the present case, plaintiff is alleging a conspiracy between a school district superintendent, the executive director of the district, and a school administrator, all of whom are employees or agents of the Board. Since all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy."), cert. den. sub. nom. *Hull v. Shuck,* 501 U.S. 1261, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991); *Moody v. Jefferson Parish School Bd.,* 803 F.Supp. 1158, 1166 (E.D.La.1992) ("Because those individuals are all employed by the Jefferson Parish School Board, this Court finds as a matter of law that they constitute a single entity incapable of forming the alleged conspiracy."), aff'd 2 F.3d 604 (5th Cir.1993).

■ Summary judgment is due on this claim because of the intracorporate conspiracy exception. Even if the court were not to grant summary judgment on that basis, however, there would still be an independent ground for summary judgment on this claim. The first element that plaintiff must show in a conspiracy claim is an agreement between the members of the alleged conspiracy. Although the existence of a conspiracy may be supported by circumstantial evidence, there must be some indication that the individuals were acting, in some sense, in concert. *See, e.g., Burrell v. Bd. of Trustees of Ga. Military College,* 970 F.2d 785, 789 (11th Cir. 1992), cert. denied 507 U.S. 1018, 113 S.Ct. 1814, 123 L.Ed.2d 445 (1993). Where there is no indication of an agreement to act against the constitutional rights of an individual there is no cause of action under § 1985. *See, e.g., Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), aff'd, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

■ In this case, the Plaintiffs have not been able to bring forth any evidence that there was somehow a meeting of the minds between the defendants to deny Bethany Godby of her civil rights. In their response to the motion for summary judgment, Plaintiffs discuss the actions of Wilson, Lovrich, and Bradford, and the roles that they all individually played in the actions regarding Godby. Plaintiffs have not linked these actions to some sort of agreement, however, either circumstantially or directly. Defendants may have bungled their roles at different points. As Plaintiffs assert, Lovrich probably should not have instituted a biracial election, Wilson probably should not have allowed it to continue, and Bradford might have been able to assist Bethany Godby in understanding her predicament at some point. None of this amounts to a conspiracy, however. A conspiracy cannot be shown merely by showing that each employee played a part in denying a place on the ballot to Godby (or in making sure there was a dual race ballot). Rather, an agreement must be shown. There is simply no evidence of such. Mr. Godby admits this, but states that he

would think it impossible for the actions taken to have occurred without agreement or support, *Mr. Godby Depo. 75:11 – 76:23.* Supposition is not sufficient to withstand summary judgment, however.

### Section 1986.

■ 42 U.S.C. § 1986

provides a cause of action against anyone who has knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having the power to prevent or aid in preventing the commission of the same, neglects or refuses to do so. *Park v. City of Atlanta,* 120 F.3d 1157, 1159 (11th Cir.1997). In effect, it is "derivative of § 1985" and a violation of § 1986 cannot be established "without establishing a violation of § 1985." *Id.* at 1160. Because the Plaintiffs could not establish a § 1985 claim, summary judgment on the § 1986 claim is also due to be granted.

### Title VI.

Title VI is an exercise of Congress' Spending Clause power. The statute reads:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Basically, Title VI establishes that those who receive federal funds may not racially discriminate. As put by Justice White, the philosophy is "Stop the discrimination, get the money; continue the discrimination, do not get the money." *Guardians Ass'n v. Civil Service Comm'n,* 463 U.S. 582, 599, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983).

■ This cause of action stands against the MCBOE only. Because Title VI liability is based on a contractual-type relationship between the federal government and the receiver of a federal grant, only the local school district which actually receives the federal money may be held liable-not an employee of the entity. *See Floyd,* 133 F.3d at 789 (hold-

ing that only local school district who received federal funds may be liable under Title IX).[15] It is uncontested that MCBOE was receiving federal funds.

■ The Godbys' Title VI claim actually requires no further analysis at this stage of the litigation. Title VI "like the Fourteenth Amendment, bars only intentional discrimination." *Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1406 (11th Cir. 1993). The only exception to this is when the plaintiff brings a claim under the Title VI regulations, which because of the contractual nature of the agreement, "may validly proscribe actions having a disparate impact on groups protected by the statute, even if those actions are not intentionally discriminatory." *Id.* The Godbys have not alleged, or shown the court, that a Title VI regulation necessitates that this court analyze the present case as anything more than a case about intentional discrimination, however.

■ In that event, the Godbys' Title VI claim is merely a restatement of their Equal Protection claim:

Technically speaking, plaintiffs challenge defendants' action under Title VI itself as well as under the equal protection clause and the Title VI regulations. Since Title VI itself provides no more protection than the equal protection clause—both provisions bar only intentional discrimination, *see Alexander v. Choate,* 469 U.S. 287, 293, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985)— we will not engage in a separate discussion of the Title VI statutory claims, as such an inquiry would duplicate exactly our equal protection analysis. Our equal protection discussion should be understood as disposing of plaintiffs' Title VI statutory claims as well.

*Elston,* 997 F.2d at 1405 n. 11; *see also Rozar v. Mullis,* 85 F.3d 556, 563–64 n. 9 (11th Cir.1996) (treating Equal Protection and Title VI claims similarly for accrual purposes).

■ The Plaintiffs may maintain their action against the MCBOE for violation of Title VI. In addition, it should also be noted,

**15.** The applicability of Title IX law in Title VI situations is discussed below.

contrary to Defendants' assertions, damages are available for intentional discrimination under Title VI. *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 70, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (In *Guardians*,[16] "a clear majority expressed the view that damages were available under Title VI in an action seeking remedies for an intentional violation, and no Justice challenged the traditional presumption in favor of a federal court's power to award appropriate relief in a cognizable cause of action"); *Waldrop v. Southern Co. Serv., Inc.*, 24 F.3d 152, 157 n. 5 (11th Cir.1994) ("*Franklin* establishes that damages are available in Title VI cases as well as Title IX cases"). Some undecided

**16.** *Guardians Ass'n v. Civil Service Comm'n of New York City*, 463 U.S. 582, 595, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983).

**17.** The unresolved questions regard the applicability of Title VII principles in this context. Plaintiffs have suggested that this court review its Title VI claim using the *McDonnell Douglas / Burdine* framework of Title VII fame. The court declines to do this, however. Recent authority suggests that it would be in error for this court to do so. In *Floyd v. Waiters*, 133 F.3d 786, 790 n. 5 (11th Cir., Jan.20, 1998), the Eleventh Circuit noted that in a previous case, [*Franklin v. Gwinnett County Public Schools*, 911 F.2d 617, 622 (11th Cir.1990), rev'd on other grounds. 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)], it had "said—in dicta—that Title VII principles did not apply to Title IX cases; and this point was not discussed nor declared to be error on review in the Supreme Court." *Floyd*, 133 F.3d at 790 n. 5. Likewise, the Eleventh Circuit in *Floyd* "gratefully" adopted the decision of the Fifth Circuit and "basically reject[ed] respondeat superior liability (and liability based on other variants of agency law) for local school districts under Title IX." *Id.* at 790. Rather, at least in a case dealing with sexual harassment of a student by a school district employee, the district "must have actual notice of the pertinent sexual harassment and then fail to act if the school district is to incur liability under Title IX." *Id.* A "school district can be liable only for the school district's own acts or omissions." *Id.*

These Eleventh Circuit statements regarding the treatment of Title IX are important because of the obvious similarities of Title VI, which bans racial discrimination by those who receive federal funds, and Title IX, which bans sex discrimination by those who receive federal funds. The Eleventh Circuit in the same footnote in *Floyd* went on to state that its "analysis of Title IX is generally consistent with of Title VI—a statutory scheme frequently considered when interpreting Title IX." *Id.* at 790 n. 5. The statement echoes a wealth of prior case law which has noted the identical nature of the two statutes. *See Davis v.*

questions regarding the standard of liability in a Title VI case may remain unresolved. Those questions need not be decided now, however. Summary judgment on this claim is due to be denied at this stage.[17]

### State Law: Negligent Supervision.

Plaintiff's complaint also charges Eberhart and the MCBOE with negligent supervision. *See Complaint at para. 49.* Despite the clear statement of the complaint that this claim is only against Eberhart and MCBOE, the Plaintiffs, in their response to the motion for summary judgment, have discussed this as a claim against Eberhart, the MCBOE,

*Monroe County Bd. of Educ.*, 120 F.3d 1390, 1398 (11th Cir.1997) ("The language of Title IX is virtually identical to the language of Title VI"); *id.* at 1399 ("The Supreme Court's study of the legislative history of Title IX has led it to conclude that the drafters of Title IX intended that courts interpret it in the same way they have interpreted Title VI"), petition for cert. filed 66 USLW 3387 (Nov. 19, 1997) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)).

Because Title VII liability may not be used in Title IX cases, therefore; and because Title IX is treated the same as Title VI; the shifting burden analysis will not be used to evaluate this claim, either. Granted these statements of the Eleventh Circuit regarding the inapplicability of Title VII law to Title VI claims are not strictly binding. Nevertheless, they are instructive enough that the court holds it should follow their logic and refuse to apply a shifting burdens analysis or Title VII standards of liability to the Plaintiffs' Title VI claim.

As noted by the Eleventh Circuit in *Floyd*, the Supreme Court has granted certiorari to consider the issue of liability under Title IX. *See Gebser v. Lago Vista Ind. School Dist.*, —— U.S. ——, 118 S.Ct. 595, 139 L.Ed.2d 431 (1997), granting cert. in 106 F.3d 1223, 1226 (5th Cir.1997) (holding that suit under Title IX may not be "based on strict liability, constructive notice, or the common law of agency."). If this case is to proceed to trial, this court will have to more fully consider the issue of Title VI liability for the MCBOE in this case. The court need not cross that bridge at this time. If the Plaintiffs' claims can proceed under the strict "official policy or custom" test of § 1983 law, their claims can probably proceed under any applicable Title VI test as well. A local school district would have "actual notice" of discrimination done by policy or custom. The "official policy or custom" test would meet the requirement of the Eleventh Circuit that "institutional liability" be based on "institutional misconduct." *Floyd*, 133 F.3d at 790.

and Principal Wilson. An amendment to add Principal Wilson would, of course, be out of time and dismissed on that ground. Nevertheless, the court need not rest the dismissal solely on that ground. Summary judgment on this claim will be granted on the basis of immunity, as well as the insufficiency of the evidence offered to support this claim.

 Alabama's Constitution provides that the State "shall not be made a defendant 'in any court of law or equity.' " *L.S.B. v. Howard,* 659 So.2d 43, 44 (Ala.1995), quoting Ala. Const. art. I, § 14. This provision provides absolute immunity to local school boards; "county boards of education are local agencies of the State and partake of the State's sovereign immunity." *Id.;* see also *Nance by and through Nance v. Matthews,* 622 So.2d 297, 300 (Ala.1993) ("State and its agencies possess absolute immunity from suit"). Therefore, the MCBOE is absolutely immune from suit under state law.

 This provision also has been determined to provide immunity to state officials, although just what protection is sometimes unclear. The state official must be engaging in discretionary acts in order to partake of his immunity. That is no major hurdle here, however. The "administration and direction of" employees has been held to be a discretionary·function because it "necessarily require[s the supervisor] to use h[is] best judgment in making those decisions affecting" schools. *Id.* (holding that principal was entitled to immunity for acts of teacher where principal had no knowledge of allegedly negligent conduct). The decisions that Superintendent Eberhart makes with regard to supervision of the principals acting in his system certainly involve the exercise of "judgment and choice" and are not merely acts done with "little choice as to when, where, how or under what circumstances." *Nance,* 622 So.2d at 300. Eberhart is entitled, therefore, to whatever protection of.immunity that is provided to state officials in Alabama.

As noted, however, deciding exactly what protection Eberhart is entitled to is some-

what confusing, at least when one looks to state decisions. In *Nance,* the court dismissed a negligent supervision claim filed against a school principal, nurse, and supervisor for the acts of a teacher's aide. The plaintiff had failed to show that the principal, nurse, and supervisor had acted in bad faith, with fraud, or beyond their authority. *Id.* at 302. *Nance* appears to say that the immunity to which superintendents are entitled, therefore, is something akin to qualified immunity: they are immune unless acting in bad faith.

Other state cases of more recent vintage say, however, that public officials performing discretionary acts are absolutely immune under Alabama law. *Louviere v. Mobile County Bd. of Educ.,* 670 So.2d 873 (Ala.1995) holds that school principal, supervisor, and maintenance man were entitled to immunity for the discretionary acts of a maintenance man in covering a hole. The case does not discuss whether acts of the officials were in bad faith, with fraud, or beyond their authority.[18] Likewise in *Bathgate v. Mobile County Bd. of School Comm'rs,* 689 So.2d 109, 112 (Ala.Civ.App.1996), the Court of Civil Appeals held that a principal, maintenance engineer, and maintenance coordinator for a school were immune from suit for their actions (and the actions of lower level employees) in dealing with a pigeon infestation. Again, the court does not discuss whether the supervisors were acting with bad faith, etc. The fact that they were acting in a discretionary area-an area where there were no " 'hard or fast' rules"—was enough to be immune. *Id.* State decisions appear to be moving, therefore, from a form of limited immunity for state officials to a form of absolute immunity.

The court need not concern itself with the dispute in state courts, however. The Eleventh Circuit has interpreted Alabama immunity to be absolute. As noted in *McMillian v. Johnson.* 101 F.3d 1363, 1365 (11th Cir. 1996), cert. den. — U.S. ——, 117 S.Ct. 2514, 138 L.Ed.2d 1016 (1997), Alabama law apparently provides "no clear answer." Nevertheless, the Eleventh Circuit in *Tin-*

---

**18.** This case is further confusing because it makes it appear that the immunity of a local

school board would be based upon the granting of this immunity by act of the state.

*ney v. Shores*[19] established a clear answer for Alabama, holding that "a claim against an Alabama sheriff in his individual capacity is barred by the doctrine of sovereign immunity." *McMillian*, 101 F.3d at 1364–65 (reversing trial court which had held that officials were not entitled to immunity for "intentional or malicious wrongdoing in their individual capacities").[20] Any apparent confusion of the Alabama courts is not important, therefore. The Eleventh Circuit has said that immunity clearly applies, therefore it does. *McMillian*, 101 F.3d at 1365. Since the Eleventh Circuit presides over this court, its interpretation is a correct statement of Alabama law as far as this court is concerned. *See Flood v. State of Ala. Dept. of Ind. Rel.*, 948 F.Supp. 1535, 1549 n. 53 (M.D.Ala.1996) ("Similarly, this court is bound by *Tinney*, regardless as to whether *Tinney* is right or wrong under Alabama law."). The Defendants sued under this state law claim are entitled to immunity.

■■■■ Even if the Defendants to this claim were not immune, however, the court would still grant summary judgment on this claim. In order to prove a claim of negligent supervision under Alabama law, the Plaintiffs would be required to prove

"that the employer had notice or knowledge (actual or presumed) of the employee's alleged incompetency for the employer to be held responsible; demonstrating liability on the employer's part requires affirmative proof that the employee's alleged incompetence was actually known to the employer or was discoverable by the employer if it had exercised care and proper diligence."

*Ledbetter v. United Amer. Ins. Co.*, 624 So.2d 1371, 1373 (Ala.1993) (brackets deleted), quoting *Perkins v. Dean*, 570 So.2d 1217, 1219–20 (Ala.1990). Here, Plaintiffs have not specified or shown that there were some pre-existing signs, or intimations, of future negligence on the part of Principal Wilson, or others supervised by Eberhart. The fact that something wrong, or negligent, occurred is not sufficient for a finding of liability. Rather, liability requires that the employer know or have some notice that those he supervises are likely to be negligent. *Ledbetter*, 624 So.2d at 1374 (granting summary judgment because "there is no evidence in the record that the [supervisor] knew or should have known" that its employees intended to defraud the plaintiff). Plaintiffs have not come forward with something like past acts of racial discrimination (other than the previous elections), or notice of intent to racially discriminate, on the part of those that Eberhart supervises. Presenting simply some evidence of possible misconduct in the handling of the Godby situation is not enough. *See Mardis v. Robbins Tire & Rubber Co.*, 669 So.2d 885, 889 ("This may be done by showing specific acts of incompetency and showing that they were brought to the knowledge of the master, or by showing them to be of such a **nature, character, and frequency** that the master, in the exercise of due care, must have had notice of them") (emphasis added). Without such evidence of the likelihood of misconduct, negligent supervision cannot be found. Foreseeability is, after all, the touchstone of liability for negligence. *Looney v. Davis*, —— So.2d ——,

19. 77 F.3d 378 (11th Cir.1996).

20. To make the matter even more confusing at the state level, the Alabama Supreme Court has cited *Tinney* as a correct statement of the law. The Alabama decision implies that *Tinney* may be limited to suits against Sheriffs and Deputies. In other words, those officials are entitled to a special form of immunity. *Ex parte Purvis*, 689 So.2d 794, 796 n. 2 (Ala.1996); *see also id.* at 796–97 (Houston, concurring specially). *See also Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1430–31 (11th Cir.1997) (implying that Sheriffs and deputies may be entitled to greater degree of immunity than other state officials, yet holding that jailers should be entitled to same amount of immunity.). Nevertheless, *Tinney* does not lead this court to believe that immunities are different for Sheriffs and other state officials. Other district courts have found that the protections of full immunity apply to state officials other than Sheriffs. *Flood v. State of Ala. Dept. of Ind. Rel.*, 948 F.Supp. 1535, 1549 (M.D.Ala.1996) (Thompson, J.) (holding that director of state Department of Industrial Relations, former director of Department, and administrator of worker's compensation division of department were entitled to full immunity in their official and individual capacities against invasion of privacy suit.).

——, 1998 WL 57736 at *7 (Ala., Feb.13, 1998) ("It is an accepted principle that a defendant is liable for all the foreseeable injuries caused by his negligence."), quoting *Williams v. Woodman*, 424 So.2d 611 (Ala. 1982). Summary judgment on this claim is due to be granted.

### State Law: Invasion of Privacy.

 For the same reasons stated in the discussion of the negligent supervision claim, the Defendants sued under this count, Eberhart and Wilson, are entitled to a form of full immunity which protects them from suit in their individual and official capacities. In *Flood v. State of Ala. Dept. of Ind. Rel.*, 948 F.Supp. 1535, 1549 (M.D.Ala.1996) (Thompson, J.), referenced above, Judge Thompson of this district held that a director of a state department, the former director of the department, and a supervisor of a division in that department, were entitled to the sort of absolute immunity that Sheriffs have under *Tinney* and *McMillian*. Interestingly enough, that decision was made in the context of an invasion of privacy claim against the officials. *Id.*

 Even if the court were not to grant summary judgment on the grounds of immunity, however, it notes again that it would be inclined to grant summary judgment on the merits of this claim. Plaintiff has brought this claim under the theory of "false light" invasion of privacy. In *Schifano v. Greene County Greyhound Park*, 624 So.2d 178, 180 (Ala.1993), the Supreme Court of Alabama adopted the Restatement version of the tort. It states:

"One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be *highly offensive* to a reasonable person, *and*

(b) the actor had knowledge of or acted in reckless disregard as to the *falsity of the publicized matter* and the *false light* in which the other would be placed."

*Id.*, quoting Restatement of Torts, 2d. § 625E. In *Schifano*, the Alabama Supreme Court affirmed summary judgment for the defendant on a false light claim. The plaintiffs had sued because of publication of a photograph of them at a dog betting track. The court stated that the "photograph does not reflect false information that would be offensive" and that "the Park did not act with knowledge of, or reckless disregard for, the 'falsity of the publicized matter or the false light in which [the plaintiffs] would be placed.'" *Schifano*, 624 So.2d at 180–81.

 If the court were to analyze Godby's invasion of privacy claim on its merits, the court would have difficulty finding that (1) the defendants invaded her *privacy*, since she, after all, was the one who brought the story to the public's attention, (unless this claim is based completely on the theory of falsity), (2) that merely offering an alternative version of the events is highly offensive to a reasonable person, and (3) that there is sufficient evidence that the defendants acted intentionally, or recklessly.[21]

Plaintiffs are asking this court to punish someone for offering their version of an event, when it was the Plaintiffs who made the event public in the first place. The Plaintiffs knew that there were possible repercussions to bringing these events before the public eye. *See K. Godby Depo. 25:8–20, 30:9 – 31:15; J. Godby Depo. 48:22 – 49:5 ("Q. Any other thing that you saw, as a negative? A. That it would be an invasion or an invitation of an invasion of privacy. Q. Anything else? A. That once we opened it up as far as to a news media, you're pretty much opening up to all of them. Again, an invasion of privacy"); B. Godby Depo. 63:2–9 ("... The only real consequences were to be people recognizing me out on the street or, you know, just speaking to me, bothering me—you know, just an invasion of privacy kind of, people knowing about my private life.").* One repercussion is that other people may offer a different interpretation of those events. Granted, that speaker may not offer an intentionally false or recklessly false ver-

---

21. Indeed, there is not sufficient evidence that some of the defendants acted at all. The court is not clear that Lovrich or Bradford did anything which placed Bethany before the public eye.

**1418**

sion. The evidence does not suggest that that is what the school board employees did, however.

### IV. *CONCLUSION*

The court has given careful-perhaps too much-consideration to this case. A large amount of attention has been necessary, however, because of the great number of issues raised; the undeveloped, and changing, nature of some of the applicable law; and the failure of the briefs to adequately deal with some of the more complex legal issues. Attention has also been required, however, simply because of the importance of the decision to be reached. The court is denying summary judgment to the MCBOE because of the actions of officials who appear, at least on the face of the evidence, to have been motivated by a desire to improve the lives of school children and to improve the Montgomery County School System. This court is not oblivious to the problems of the Montgomery County School System, nor is it oblivious to the desires of educators to mollify racial issues, so that the more important task of education can be undertaken. Nevertheless, the MCBOE may not, at least after the Supreme Court's announcements in recent years, divide their students, or classify their students, on the basis of race without a compelling, narrowly drawn, reason. Such a reason is not present here.

The case will proceed on two issues:

(1) Plaintiffs may proceed on their § 1983 claim against the MCBOE (the § 1981 claim is merged into this claim).

(2) Plaintiffs may proceed on their Title VI claim against the MCBOE.

Summary judgment is GRANTED as to all other claims against the MCBOE, and is GRANTED in full as to the individual defendants. .