Donnie **GRANGER, et al., Plaintiffs,**

v.

**Marshall J. WILLIAMS, Jr., Defendant.**

**Kenneth E. Lightner, et al., Plaintiffs,**

v.

**Marshall J. Williams, Jr., Defendant.**

Nos. CIV.A. 00–D–1175–N,
CIV.A. 00–D–1705–N.

United States District Court,
M.D. Alabama,
Northern Division.

Jan. 24, 2002.

A. Wesley Pitters, A. Wesley Pitters, P. C., Montgomery, AL, for Plaintiffs.

C. Winston Sheehan, Jr., Allison L. Alford, Ball, Ball, Matthews & Novak, P.A., Montgomery, AL, for Defendant.

### MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is a Motion For Summary Judgment ("Mot."), which, along

with a supporting brief, was filed by Defendant Marshall J. Williams, Jr., ("Williams") on November 14, 2001. (Doc. Nos. 13, 14.) Plaintiffs Donnie Granger, Johnny Wilson, Kenneth Lightner, Richard Johnson, and Evelyn Person ("Granger", "Wilson", "Lightner", "Johnson", "Person", and collectively "Plaintiffs") jointly filed a Response ("Resp.") on December 14, to which Williams filed a timely Reply on December 20. (Doc. Nos. 24, 26.) Accompanying said Reply were three Motions to Strike, to which Plaintiffs have not responded. (Doc. Nos. 21–23.) However, Plaintiffs have filed a Supplemental Brief to further buttress their arguments. (Doc. No. 27.) After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Williams' Motions to Strike are due to be granted in part and denied in part; similarly Williams' Motion For Summary judgment is due to be granted in part and denied in part.

## I. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1343(a)(3). The parties do not contest personal jurisdiction or venue.

## II. SUMMARY JUDGMENT STANDARD

When a party moves for summary judgment, the court construes the evidence and makes factual inferences in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). At this juncture, the court does not "weigh the evidence and determine the truth of the mat-

ter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted).

This determination involves applying substantive law to the pertinent facts that have been developed. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence presented. *See id.* at 248, 106 S.Ct. 2505; *Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. If this task is satisfied, the burden then shifts to the non-moving party, which must designate specific facts remaining for trial and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An action will be dismissed when the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *See id.* at 587, 106 S.Ct. 1348.

## III. FACTUAL BACKGROUND

The present matter focuses upon the hiring and promotion practices of Williams, the white Sheriff of Barbour County, Alabama. Plaintiffs are African–Americans who allege that Williams' practices in the employment context violated their right to Equal Protection under the law as secured by the Fourteenth Amendment. Lightner, Johnson, Granger, and Wilson ("male Plaintiffs") each allege that they applied for the position of deputy, but that Williams did not hire them on the basis of their race; Person, on the other hand, was already employed in the Barbour County jail, but she alleges that she was denied an internal promotion because of her race.

Though the suits, which are brought against Williams in both his individual and official capacities,[1] originally began as two separate matters, the factual overlap compelled the court to consolidate the cases on March 1, 2001. (Doc. No. 11.) The following is an account of those overlapping facts, viewed in the light most favorable to Plaintiffs.

Williams has served as the Sheriff of Barbour County since November of 1998. (Williams Dep. at 25.) Although he retained the deputies of the previous administration, he restructured the hierarchy in that, rather than there being one chief deputy, he made two captains, each designated to patrol a portion of Barbour County. (Williams Aff. ¶ 2.) Williams points out that one of these captains, Stern Neumon ("Neumon"), is an African–American, and that in his tenure he has also hired three other African–Americans. (*Id.* at 2, 3.) Additionally, he contends that he extended job offers to a number of African–Americans who simply did not accept them. (*Id.* at 3.) He does acknowledge that he did not extend offers to the male Plaintiffs and that he did not promote Person, but he also contends that he likewise did not extend offers to several white applicants. (Williams Dep. at 88–89, 160; Williams Aff. at 4.) Nevertheless, Williams admits that, in the end, each of the respective positions sought by Plaintiffs was filled by a Caucasian. (Williams Aff. ¶ 8.)

■ Prior to applying for a deputy position at Barbour County, Lightner had five years of law enforcement experience with the Clayton Police Department. (Lightner Dep. at 60–62.) Indeed, the majority of this tenure was served as a certified police officer, as he was a 1991 graduate of the Southwest Alabama Police Academy. (*Id.* at 61–62.) During the latter part of the last decade, Lightner worked several higher paying jobs as a security officer, but he was still a reserve officer, and, in fact, he had worked under Williams at this time. (*Id.* at 27–28, 71–75.) In January of 1999, Lightner submitted an application for a deputy sheriff position, and Williams informed him that he did not hire part-time deputies, but that Lightner's application would be considered if he left his full-time job as a security officer. (*Id.* at 31, 104.) Williams contends that, while some of his full-time deputies have part-time jobs outside the force, permitting the deputies to have additional full-time jobs would interfere with their duties. (Williams Aff. ¶ 7.) However, Neumon, Barbour County's African–American captain deputy, testifies that Williams permitted a white deputy named Robin Daniels to retain full-time employment with another police department.[2] (Neumon Aff. ¶ 14.) Lightner ap-

---

1. Because Alabama law recognizes county sheriffs as executive officers of the state, lawsuits seeking money damages against such officers are barred by the Eleventh Amendment. *Carr v. City of Florence, Ala.,* 916 F.2d 1521, 1524–25 (11th Cir.1990). Accordingly, only the claim seeking injunctive relief against Williams in his official capacity may proceed; all other claims against him in his official capacity are due to be dismissed. *See Tinney v. Shores,* 77 F.3d 378, 383 (11th Cir. 1996). However, all claims against Williams in his individual capacity may proceed, subject only to the defense of qualified immunity which will be discussed infra note 7.

2. Williams objects to this testimony on the grounds that Neumon had no basis for knowing such matters. *See* Fed.R.Civ.P. 56(e) (requiring that "affidavits shall be made on personal knowledge"). As one of Barbour County's Captain Deputies, Neumon was occasionally consulted on employment matters. (Neumon Aff. ¶ 5.) The court is satisfied that he was aware of the employment status of his fellow workers. The court notes that it would have been better had Plaintiffs deposed Daniels, but it cannot conclude that Neumon's assertions are outside the ambit of his experience such that the affidavit is due to be stricken. *Cf. White v. Wells Fargo Guard Servs.,* 908 F.Supp. 1570, 1577–78

parently opted to retain his full-time security officer position, for, beyond charges of racism, he offers no other evidence surrounding the denial of his application.

Johnson also attended the Southwest Alabama Police Academy, having graduated in 1989. (Johnson Dep. at 47.) Thereupon he worked at the Clio Police Department for five years, the latter of which found him serving as chief of police. (*Id.* at 74–77.) Although he moved to Clayton where he served as a patrolman from 1994 to 1998, he returned to Clio thereafter where he was reinstated to his present position in the police force. (*Id.* at 77, 80.) Nonetheless, when Johnson submitted an application to Williams, he was not hired. (Williams Dep. at 88–89.) Williams contends that the rejection was based on the fact that Johnson owned and operated a game room, and because he had heard rumors suggesting that Johnson's wife sold drugs. (*Id.*) At the time, however, he did not inform Johnson that these were the reasons for refusing to hire him. (*Id.* at 101.)

Granger likewise had extensive service in law enforcement prior to seeking employment under Williams. (Granger Dep. at 26–32.) With the exception of a few brief stints as a truck driver in 1990, 1993, and 1998, Granger has been employed by a number of law enforcement agencies since 1987. (*Id.*) In fact, he served as a deputy sheriff with the Barbour County Sheriff's Department from 1993 to 1996, and as a narcotics investigator under the Barbour County District Attorney from 1996 to 1998. (*Id.* at 29.) Toward the end of his time as a narcotics investigator and the beginning of Williams' tenure as sheriff, Granger unsuccessfully sought employment, despite having submitted two applications. (*Id.* at 49.) Williams told him that the job was promised to a white male named Michael Saad, but should Saad back out, Granger would get the job. (Granger Aff. ¶ 2.) However, neither Saad nor Granger was ever hired. (*Id.*) Williams asserts that he decided not to hire Granger upon learning that he had received a three-day suspension without pay for spraying a prisoner with a water hose in 1995. (Williams Dep. at 88; Williams Aff. ¶ 6; Granger Dep. at 101–03.) Williams never discussed the issue with Granger. (Williams Dep. at 101.)

Wilson is another police academy graduate who began his career in law enforcement in 1986. (Wilson Dep. at 26.) However, he was seriously injured in an automobile accident in 1988, and he did not work for approximately ten years thereafter, instead surviving on social se-

(M.D.Ala.1995) (striking portions of affidavit where "the affiant does not claim to know anything" about the underlying facts). Accordingly, the Motion To Strike this portion of Neumon's affidavit is due to be denied.

At this point, it is necessary to address Williams' three Motions To Strike. In all, he requests that portions of sixteen paragraphs be stricken from the record, and some of his contentions are meritorious. For instance, Person testifies that "Williams utilized no objective criteria" in making his job determination. (Person Aff. ¶ 5.) The court agrees that such self-serving, conclusory allegations have no possible basis in personal knowledge—whether as much can be inferred from her other testimony is the actual issue.

For the sake of efficiency, the court does not deem it necessary to explicitly rule on every objection at this point, however. Rather, for purposes of this Motion For Summary Judgment, "the court will implicitly address any meritorious objection as needed in its consideration of this motion" by simply not considering the testimony in question. *Owens v. Superfos,* 170 F.Supp.2d 1188, 1190 n. 1 (M.D.Ala.2001) (internal quotations omitted). On the other hand, when the court relies upon certain evidence, it will indicate the reasons for overruling the objections. In short, the three Motions To Strike are due to be granted in part and denied in part.

curity disability payments. (*Id.* at 27, 30, 64–65.) He returned to police work in 1998, but such a livelihood has suffered intermittent interruptions due to his disability. (*Id.* at 65–67.) Prior to Williams' election as the sheriff of Barbour County, Wilson unsuccessfully sought employment as a deputy, allegedly due to his disability. (*Id.* at 103–04.) He later submitted an application to Williams and spoke on occasion with Williams about the matter. (*Id.* at 127–28.) Williams told him that he would be in touch when there was an opening, but Wilson never received a call. (Wilson Aff. ¶ 2.) Williams points out that Wilson had been arrested for harassment once, and that, when Wilson was a police officer, a woman filed a complaint concerning his behavior during a traffic stop. (Wilson Dep. at 142; Williams Dep. at 143.) He also alleges having heard that Wilson consumed alcohol while on duty. (Williams Dep. at 88.) Again, these incidents were never discussed with Wilson. (*Id.* at 101.)

Person, the final Plaintiff, has worked at the Barbour County Jail for approximately fourteen years, and she presently serves as the jail's supervisor. (Person Dep. at 26–27.) She attended a course in jail management in 1994 where she learned the basic skills integral to jail administration ranging from booking new inmates to dealing with their day-to-day needs. (*Id.* at 16–17.) These general skills are put to work in her daily tasks which range from administrative, clerical, and care-giving. (*Id.* at 27.) Shortly after Williams became the sheriff, Person spoke with him about becoming the jail administrator, and submitted an application for the same. (*Id.* at 36–37.) However, a white female was hired for the position and was given a white assistant, even though neither was a certified jailer like Person. (Person Aff. ¶ 4.) Williams alleges that Person's application did not specifically request the position of jail administrator, and that when she asked him about the position it was already filled. (Williams Dep. at 55; Person Dep. at 70–71.) Moreover, he contends that she was not deserving of the promotions since her personnel file contained complaints as to tardiness, suspected mishandling of funds, and poor interpersonal skills. (Person Dep. at 38–57.)

Not only were the positions sought by Person filled by whites, but the deputy sheriff positions were also filled by three whites, Lonnie Adams, Brian Smith, and Larry Hubbard. (Williams Aff. ¶ 8.) None of these formally submitted an application to Williams; they simply approached him in person having heard that he was hiring, and they subsequently were hired. (Williams Dep. at 119.) He even bought out their present contracts to immediately get their services. (*Id.*) At this time, Adams had yet to finish training at the police academy, and Smith and Hubbard had only recently graduated. (*Id.* at 106; Neumon Aff. ¶ 7.) Williams points out, however, that he was unaware of any significant blemishes on their records to make them unworthy candidates. (Williams Aff. ¶ 8.) By the same token, neither does he recall engaging in a significant investigation into their backgrounds. (Williams Dep. at 118.) However, Neumon has testified that he brought to Williams' attention the fact that Hubbard had been indicted for theft, to which Williams responded that the felony indictment had been reduced to a misdemeanor.[3]

---

**3.** Williams objects to this testimony on the grounds that Neumon had no basis for knowing such matters. *See* Fed.R.Civ.P. 56(e) (requiring that "affidavits shall be made on personal knowledge"). The court first notes that it believes Neumon was aware of what he said to Williams. Moreover, as Neumon was a high-ranking police officer with access to such records, the court infers sufficient basis for knowing the facts of an individual's arrest. *Cf. Owens,* 170 F.Supp.2d at 1190 n. 1 (find-

(Neumon Aff. ¶ 8.)

Williams offers the testimony of Berry Forte, an African–American Barbour County Commissioner, who states that Williams asked him if he knew of "any black folk" that might be interested in being his deputy. (Forte Dep. at 25.) The record does not indicate when this conversation was held. Neumon has testified that he was regularly consulted whenever a black sought employment, and although Neumon recommended that Williams hire each of the male Plaintiffs as deputies, Williams disagreed saying "I have to be careful when it comes to hiring a black deputy. I'd rather be safe than sorry." (Neumon Aff ¶ 5, 10.)[4] Moreover, not only did Williams never inform the male Plaintiffs as to his alleged reasons for not hiring them, he never shared these reasons with Neumon.[5] (Id. at 9–12.) As no other relevant evidence has been offered by either parties, the court will now proceed to analyze the preceding facts in the light most favorable to Plaintiffs.

## IV. DISCUSSION

■ Although Plaintiffs bring their discrimination claims pursuant to both 42 U.S.C. § 1981 and 42 U.S.C. § 1983, the court finds that the claims are due to be merged into a single cause of action under § 1983. See Godby v. Montgomery Co. Bd. of Educ., 996 F.Supp. 1390, 1411 (M.D.Ala.1998); see also Butts v. County of Volusia, 222 F.3d 891, 893 (11th Cir.

2000) (holding that " § 1983 constitutes the exclusive remedy against state actors for violations under § 1981"). Under such a cause of action, Plaintiffs can establish discriminatory intent by either circumstantial or direct evidence. Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998). This distinction is important, for the analytical framework applied by the court varies depending upon the type of evidence in consideration. Id. Whereas circumstantial evidence creates merely a rebuttable presumption of discrimination, see Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), direct evidence shifts the burden of proof to a defendant to "prove by a preponderance of the evidence that the same employment decision would have been made in the absence of the discriminatory intent." Standard, 161 F.3d at 1330.

### A. Discriminatory Hiring Practice Claims

■ The male Plaintiffs argue that Williams' remarks that he had "to be careful when it comes to hiring a black deputy," and that he would "rather be safe than sorry" constitute direct evidence that race played an improper role in Williams' employment decisions. Direct evidence is "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected characteristic." Wright v. Southland Corp., 187 F.3d

---

ing that basis for knowing can be inferred from the nature of the affiant's employment status). Accordingly, the Motion to Strike this portion of Neumon's affidavit is due to be denied.

4. Williams objects to a portion of these paragraphs in Neumon's affidavit, but his Motion To Strike does not specifically refer to the present language. This is for good reason as Neumon undoubtedly had a basis to know that Williams made such a comment; more-

over, the statement is not hearsay insofar as it goes to motive for it is not admitted for the truth of whether Williams had to be careful, but rather that he might have been motivated by race. See Bergene v. Salt River Project Agric. Improvement & Power Dist., 272 F.3d 1136, 1141–42 (9th Cir.2001).

5. Here the court only refers to admissible testimony to which Williams did not specifically object.

1287, 1298 (11th Cir.1999). The Eleventh Circuit has observed that "a statement that members of a racial minority in general ... are simply not competent enough to do a particular job would seem to be a classic example of direct evidence." *Haynes v. W.C. Caye & Co.,* 52 F.3d 928, 931 (11th Cir.1995) (holding that statement regarding fitness of women for particular job constituted direct evidence of gender discrimination). While not denying having made the statements, Williams insists that they are subject to interpretation insofar as he has made efforts to seek out "qualified black applicants." (Mot. at 3–4.) He has provided the court with no plausible alternative interpretations, however, beyond the plain intention conveyed by the language: race played a factor in Williams' employment decisions. *Cf. Miles v. M.N.C. Corp.,* 750 F.2d 867, 873–74 (11th Cir.1985) (holding that racial slur in the context of a discussion of workforce composition constituted direct evidence of discrimination).

Williams apparently is arguing that his alleged search for African–American candidates calls into question whether or not race "played a motivating part in an employment decision." *Haynes,* 52 F.3d at 931 (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 242, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). The only evidence he offers in this regard are his own testimony and the statement of Forte, the County Commissioner, who testified that Williams approached him and inquired whether he knew of "any black folk" who might want a job. (Williams Dep. at 90; Forte Dep. at 25.) Context is the key consideration in the direct evidence analysis, and no evidence is offered as to the context of the conversation Williams shared with Forte. It may have occurred when Williams took office, or it may have taken place when

Williams found himself subjected to discrimination lawsuits. But more importantly, the possibility that Williams was actively seeking prospective black applicants does not negate the proposition laden in his statements, namely that he is especially scrupulous when considering such applicants. Without more, the evidence is insufficient to minimize the significance of Williams' statements that explicitly were made to Neumon in the context of deciding not to give consideration to African–Americans.

The record is not clear as to whose application was under consideration when Williams made the statements, although the Neumon affidavit indicates that Williams commented as such with respect to at least three of the deputy applicants. (Neumon Aff. ¶ 10.) It should not matter, though, at least for purposes of the male Plaintiffs, whether the comment was made in the context of only one of their applications, for it indicates a general reluctance on the part of Williams to hire black deputies. *See EEOC v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1287 (11th Cir.2000) (holding that "direct evidence of an intent to discriminate may be used to establish a pattern or practice claim"). As such, the court finds that the male Plaintiffs have established direct evidence that Williams inappropriately used race as a factor in the hiring of deputies.

 Although Williams has also offered non-discriminatory reasons for his decision not to hire Plaintiffs, in the face of direct evidence, the burden is his to establish, by a preponderance of the evidence, that he would have made the same decision notwithstanding his discriminatory intent. *Standard,* 161 F.3d at 1330. His proffered justifications were never expressed to Plaintiffs, and they contradict other evidence in the record.[6] Because the facts at

---

6. Each of the male Plaintiffs gained employment in the law enforcement field both prior

to, and following Williams' rejection of their

this stage are to be viewed in the light most favorable to Plaintiffs, the court finds that there are genuine issues of fact as to whether the four male Plaintiffs were denied employment on the basis of their race. *Cf. Moore v. Alabama State Univ.*, 980 F.Supp. 426, 434 (M.D.Ala.1997) (denying summary judgment in the face of direct evidence of gender discrimination). Accordingly, summary judgment is due to be denied on the male Plaintiffs' claims.[7]

#### B. *Person's Failure to Promote Claim*

■ Notwithstanding the forgoing discussion, the court does not believe that Williams' remarks can be construed as direct evidence of Person's failure to promote claim. Not only was Person not seeking a position as a Barbour County deputy, she was already employed by Barbour County. While Williams' remark plainly attests to his misgivings when it comes to initiating new deputies into his force, it does not so readily indicate a similar misgiving as to the race of his present employees in a different division. The argument might be made that Williams' statement is emblematic of an overarching policy to curtail any and all

employment opportunities on the basis of race, but this conclusion is inferential. Accordingly, for purposes of Person's claim, Williams' statement is to be regarded merely as circumstantial evidence of discrimination. *See Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989) ("Direct evidence of discrimination would be evidence which, if believed, would prove the existence of fact *without inference or presumption*.") (emphasis added).

The court applies the *McDonnell Douglas* burden-shifting analysis to cases involving circumstantial evidence of discrimination. *Standard*, 161 F.3d at 1331. Under this approach, Person's initial burden is to establish a prima facie case, thereby creating a presumption of discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). She can establish a prima facie case of discrimination in this regard by pointing to evidence showing that (1) she is African–American; (2) she was qualified for the position as Barbour County jail administrator; (3) she was not promoted; and (4) a white person ultimately filled the posi-

---

applications. This fact calls into question the persuasiveness of Williams' argument that he would not have hired them anyway. It can be countered, of course, that Williams simply has higher expectations of his police officers than other police forces in the area, but this conclusion is seriously undermined upon consideration of the evidence before the court. For instance, although he claims to have been concerned about Johnson's moral character, he did not appear bothered by the criminal background of Larry Hubbard, a white deputy Williams subsequently hired. Additionally, the disparity between Williams' ultimatum to Lightner while permitting Robin Daniels to retain a full-time job at least raises a material fact as to Williams' true motive. Finally, it is unclear whether Granger's and Wilson's allegedly unprofessional histories were known to Williams at the time he chose not to hire them, and, even if they were known to him, whether a jury would find them to be suffi-

cient reasons for overlooking the significant disparity in work experience between these two and the white deputies Williams came to hire.

7. Williams seeks to invoke the defense of qualified immunity for the claims brought against him in his individual capacity. (Mot. at 18.) The defense is available only to government officials performing discretionary functions in such a manner that infringes on a right that was not clearly established at the time of the conduct. "It is clearly established that the equal protection clause affords ... a right to be free from racial discrimination." *Busby v. City of Orlando*, 931 F.2d 764, 775 (11th Cir.1991). Because the facts raise a jury issue as to whether Williams intentionally violated this clearly-established right, he cannot seek protection in the qualified immunity doctrine.

tion sought. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see also Wu v. Thomas,* 847 F.2d 1480, 1483 (11th Cir.1988). Williams may rebut the presumption, however, by producing evidence that his decision not to promote Person was "for a legitimate, non-discriminatory reason." *Hicks,* 509 U.S. at 506, 113 S.Ct. 2742. Person then must show that the proffered justifications were merely pretextual, at all times bearing the ultimate burden of proving intentional discrimination. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

The court is satisfied that Person has established a prima facie case on her claim. She is black and the eventual jail administrator (as well as the assistant jail administrator) is white. Person's extensive experience and training with regards to jail administration reflect positively on the extent of her qualifications, especially given the significant overlap between such qualifications and the duties required of the jail administrator. (Person Dep. at 17–18, 27; Williams Dep. at 72–74.) Indeed, Williams does not appear to contest Person's prima facie case; rather his argument focuses on allegedly legitimate and non-discriminatory reasons for not promoting Person.

 Williams offers a number of reasons as to why he did not promote Person, the first being that he was never made aware of her interest in the position. The application that Person submitted did not give mention of the position of jail administrator; rather, on the line denoting the "Employment Desired," Person merely wrote "Same as now." (Person Dep. Ex. B.) In her deposition, she testified that when she first expressed to Williams her interest in the position that he replied that the position was already filled.[8] (Person Dep. at 70–71.) Indeed, Williams testified that Hartzog, the white jail administrator appointed by Williams, was already serving as acting jail administrator when Williams took office and that he formally appointed her in recognition of her experience with the position. (Williams Dep. at 55–56.)

The only evidence even remotely touching upon the issue of race is Williams' statement as to the hiring of black deputies. The court recognizes the probative value that such a statement might have in terms of showing that all employment decisions made by Williams were tainted by discriminatory intent. However, the court also observes the necessity of avoiding the slippery slope of concluding that all dissatisfied employees suffer their plight due to their race. It is noteworthy in this regard that Hartzog was already acting as the jail administrator and Williams was given no reason to believe she should not continue in her position. Moreover, Williams has presented a significant number of negative reviews from Person's personnel file suggesting that her qualifications are less impressive than she might believe.[9] Indeed,

---

8. This statement is contradicted by a portion of Person's affidavit which states Williams had not yet appointed Hartzog when Person discussed the position with him. (Person Aff. ¶ 3.) The general rule is that affidavits are due to be stricken when they are "inherently inconsistent with [prior] deposition testimony." *Rice v. Barnes,* 149 F.Supp.2d 1297, 1300 (M.D.Ala.2001). However, even were the court to conclude that this unexplained inconsistency raised a genuine issue of fact as to whether Williams was actually aware of Person's employment desire, the legitimate reasons discussed below are sufficient to rebut her prima facie case. *See infra* note 9.

9. Indeed, just weeks before she filled out her application, she was suspected of stealing from the department's petty cash funds. (Person Dep. Ex. E.) Also, her supervisory skills were given the lowest marks possible in an internal job evaluation which also criticized her bookkeeping skills. (Person Dep. Ex. I.) These two incidents are in addition to a number of previous instances in which she was written up for shoddy workmanship,

Williams argues that Person's prior shortcomings as an employee would have prevented him from promoting her, even had he been aware of her desire for promotion. Not only does the court believe these reasons to be legitimate and non-discriminatory, it finds that Williams statements to Neumon do not suggest that Williams' justifications are pretextual. The court simply does not find there to be sufficient evidence for Person's claim to reach a jury, so summary judgment is due to be granted on her failure to promote claim.

## V. ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Defendant Marshall J. William's Motions To Strike be and the same are hereby GRANTED in part and DENIED in part, and that William's Motion For Summary Judgment be and the same is hereby GRANTED in part and DENIED in part. As Plaintiff Evelyn Person's claim has been dismissed, the clerk is DIRECTED to remove her name from the caption of the present matter.

rudeness, and arriving to work late. (Mot. at 12–13.)